Ann ZARRELLA et al.

v.

**MINNESOTA MUTUAL LIFE
INSURANCE COMPANY.**

No. 2001–241–Appeal.

Supreme Court of Rhode Island.

May 13, 2003.

David A. Wollin, Providence, for Plaintiff.

Michael P. DeFanti, Providence, James F. Jordan, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, J., and WEISBERGER, C.J. (Ret.).

## OPINION

WILLIAMS, Chief Justice.

The plaintiff-insured Ann Zarrella (plaintiff)[1] and the defendant-insurer Minnesota Mutual Life Insurance Company (Minnesota Mutual or defendant) have been engaged in a lengthy dispute over the proper surrender value of the plaintiff's life insurance policy.[2] Specifically, the plaintiff appeals from: (1) the Superior Court hearing justice's refusal to certify her case as a class action, and (2) the trial justice's decision to dismiss most of her claims pursuant to Rule 50 of the Superior Court Rules of Civil Procedure judgment as a matter of law.[3] Minnesota Mutual cross-appeals from the jury verdict on negligent misrepresentation and the trial justice's denial of its motion to dismiss for lack of subject matter jurisdiction. The pertinent facts are as follows.

1. The plaintiff's husband Arthur Zarrella (Arthur) was originally a party to the complaint, but the trial justice dismissed his claims because he was not a real party in interest.

2. Similar to the case of *Jarndyce v. Jarndyce*, in Charles Dickens's novel, Bleak House (Nicola Bradbury ed., Penguin Books 1996) (1853) this seemingly endless litigation has cost both parties far more than the case is worth; the parties would have been better served by mediation.

3. Two separate judges presided over the class action certification hearing and the subsequent trial. For the purpose of this opinion, we refer to the judge that presided over the certification hearing as the hearing justice and we refer to the judge that presided at trial as the trial justice.

## I

### Facts and Travel

In 1986, plaintiff purchased a life insurance policy from Minnesota Mutual on behalf of her husband (Arthur), which named herself as the beneficiary. In 1990, plaintiff purchased a second policy from Minnesota Mutual for herself with Arthur as the named beneficiary. The policies are Adjustable III Life Insurance policies that have (1) flexible death benefits and annual premiums,[4] and (2) a feature that enables the insured to use the policy as an investment tool to accumulate cash value. The policies stated that if market conditions yield an interest rate greater than 4 percent and Minnesota Mutual's mortality cost is lower than the projection of the 1980 Commissioners Standard Ordinary (CSO) actuarial table,[5] Minnesota Mutual may award the policy holder an annual dividend reflecting the market interest rate at the time the insured paid the annual premium. Minnesota Mutual marketed this potential dividend as an award of Ultimate Interest. Minnesota Mutual's policies stated that any annual dividend would be paid to the insured on the policy purchase anniversary date.

4. This is different from a "whole life" insurance policy. A "whole life" insurance policy does not allow the insured to adjust death benefits and premiums without surrendering the old policy and purchasing a new one.

5. A mortality cost is the cost of paying benefits to a beneficiary when an insured dies. By the terms of Minnesota Mutual's Adjustable III insurance policy, mortality cost cannot exceed the rates specified by the 1980 Commissioners Standard Ordinary Mortality Table (CSO table), which is a standardized, actuarial table of mortality rates for men and women of varying ages in 1980. Pursuant to G.L. 1956 § 27-4-17(d)(1), the 1980 CSO table is used by insurance companies to value life insurance in Rhode Island.

In 1994, plaintiff replaced her insurance agent, Robert Veasey (Veasey) with Joseph Caramadre (Caramadre). Caramadre is an attorney, a certified public accountant and a certified financial planner. He is also a law school friend of her son Paul, who recommended Caramadre to his mother. In 1994, Caramadre asked plaintiff to obtain an in-force illustration[6] from Minnesota Mutual on the policies that she had purchased from Veasey. The plaintiff requested the illustration, and in October 1994, Minnesota Mutual advised her that on December 10, 1994, the cash value of Arthur's policy would be $17,293, subject to an interest-accruing loan in the amount of $691. This figure reflected an annual dividend of $4,362 for 1994. Additionally, the illustration stated that on December 10, 1995, the policy would be worth $20,486, reflecting a predicted annual dividend of $4,861.

Minnesota Mutual sent plaintiff an annual policy review[7] on December 10, 1994. The statement showed that the cash value of Aurthur's policy was $17,353, based upon an actual dividend of $4,421 for 1994. The plaintiff later paid the $691 loan and requested a current policy information

statement to confirm the payment. Minnesota Mutual sent the requested statement on February 22, 1995. According to the statement, plaintiff had satisfied the debt and the new adjusted cash value of the policy was $17,766.

In May 1995, upon Caramadre's suggestion, plaintiff decided to replace her Minnesota Mutual policies with policies that Caramadre sold. She chose to replace Arthur's policy with one from Southland Life Insurance Company (Southland) and to replace her policy with one from The Mutual Group (TMG). Caramadre submitted the required paperwork to TMG and Southland.[8]

After receiving notice that plaintiff wanted to switch policies, Minnesota Mutual sent plaintiff the following statement:

> "So what have you got to lose by giving up your current policy? The answer may be a good deal of money *and* the security of knowing your policy is backed by a company with impeccable financial strength. Please read the enclosed pamphlet and make an educated comparison *before* you act. If you have

6. To provide policyholders with up-to-date information about the ever-fluctuating value of their policies, insurance agents and financial planners frequently use "illustrations" to demonstrate the potential growth over time given a certain set of facts and circumstances. For instance, an illustration can be used to demonstrate the premium that a policyholder would need to pay to retire at a specific age with desired cash value and death benefits. These illustrations are not promises, but rather, they are estimates based on assumptions that may or may not come to fruition.

7. In addition to in-force illustrations, Minnesota Mutual sends to policyholders annual policy reviews on the anniversary date of the policy. These reviews state the actual cash value on the anniversary date, any dividends paid, the amount of outstanding loans and the net death benefit under the policy.

8. While the surrender of an Adjustable III policy will often trigger a capital gain for tax purposes, 26 U.S.C. § 1035 of the Internal Revenue Code permits tax-free exchanges of life insurance policies. This is referred to as a "§ 1035" exchange and is initiated by the replacing insurer, who supplies the insured with a form that compares the existing policy with the replacement. The insured completes the form and an insurance application with the replacing insurer, who then notifies the original insurer that a § 1035 exchange has taken place. The original insurer is then obligated to pay the surrender value directly to the replacing insurer. State law requires, however, that a replacing insurer delay issuing the new policy for twenty-days after notifying the original insurer. During this time, the original insurer attempts a conservation, which endeavors to retain the contractual relationship between it and the insured.

any questions, please contact Robert Veasey * * *."

Veasey also attempted to dissuade plaintiff and Caramadre from switching policies, but his efforts were for naught. Acting on Caramadre's advice, plaintiff chose to replace both Minnesota Mutual policies.

On September 9, 1995, Minnesota Mutual sent $16,933 to Southland as payment of the full surrender value of Arthur's policy and advised plaintiff that the exchange had been finalized. When plaintiff received the statement, Caramadre realized that the figure was lower than he expected. By his calculation, plaintiff should have received between $17,293 and $20,486 according to the 1994 and 1995 illustrations. Caramadre sent a letter to Minnesota Mutual demanding an explanation for the lower surrender value. In response, Minnesota Mutual reiterated the terms of the policy contract and stated that dividends are paid, if at all, only on the policy anniversary date. Because plaintiff terminated the policy in August 1995, she was not entitled to the dividend that would have been credited on December 10, 1995, the policy anniversary date. On May 24, 1996, plaintiff and her husband filed suit against Minnesota Mutual to recover the difference between the expected surrender value and the actual surrender value.

In the complaint, plaintiff included counts for breach of contract, negligent misrepresentation and breach of the implied warranty of good faith and fair dealing. The plaintiff asserted that Minnesota Mutual did not disclose that the total cash value of the policies are contingent on the annual dividend, nor did it disclose that if the policy is surrendered between anniversary dates, the insured will not receive a pro rata share of the annual dividend.

Minnesota Mutual filed a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Superior Court Rules of Civil Procedure. The de-fendant contended that plaintiff's complaint did not satisfy the $5,000 jurisdictional requirement in G.L.1956 § 8-2-14 because the maximum difference between the expected surrender value and actual surrender value was only $3,500. The plaintiff amended her complaint to include claims for equitable estoppel and fraudulent misrepresentation and asked for a declaratory judgment. The defendant filed a second motion to dismiss pursuant to Rule 12(b)(1). The plaintiff, in response, contended that the potential punitive damages exceeded $5,000. The hearing justice agreed with plaintiff, but ordered her to amend the complaint with greater specificity, which she later did. After Minnesota Mutual answered the second-amended complaint, plaintiff filed a third-amended complaint to add claims for bad faith by refusing to settle, violations of the Racketeer Influence and Corrupt Organizations Act (RICO) and civil liability under G.L. 1956 § 9-1-2.

In August 1998, plaintiff moved to certify the case as a class action pursuant to Rule 23 of the Superior Court rules of Civil Procedure. She alleged that the affected class consisted of herself and all persons who purchased an Adjustable III Life Insurance Policy from defendant between 1984 and 1997, and those who had surrendered the policy before the policy's anniversary date for a loss of expected value. The hearing justice denied the motion and plaintiff immediately appealed the ruling to this Court by a writ of certiorari. We denied the writ, and the case proceeded to trial. After discovery, defendant moved for summary judgment, arguing that (1) plaintiff could not succeed on her misrepresentation claim because it was based on a contradiction of a term contained in the integrated insurance contract, and (2) the parol evidence rule prohibits extrinsic evidence that contradicts the terms of a completely integrated con-

tract. Minnesota Mutual's motion was denied.

Before trial, defendant filed motions *in limine* to determine the admissibility of several key pieces of evidence. First, the trial justice declined to rule on the admissibility of a letter from Minnesota Mutual Senior Vice President Richard Lee (Lee) that indicated he had paid pro rata dividends to a policyholder who had surrendered an Adjustable III policy intra-anniversary. Instead, the trial justice reserved judgment until the trial reached the bad-faith claims. Second, the trial justice decided that evidence of the Ultimate Interest method was admissible. The trial justice decided that an instruction guide that clarified the cash value of Adjustable III policies was admissible because it was relevant to the fraudulent and negligent misrepresentation claims. Third, the trial justice determined that an instruction guide on calculating cash value, which defendant issued after this litigation, was not a subsequent remedial measure. The trial justice also ruled, *sua sponte*, that the contract between plaintiff and Minnesota Mutual was unambiguous. Finally, the trial justice granted defendant's motion to bifurcate the contract and tort claims from the remaining issues. Thus, the jury would proceed to the second phase only if it found that defendant had acted fraudulently.

At the close of plaintiff's case, defendant moved for judgment as a matter of law on all counts. The trial justice granted defendant's motion as it applied to plaintiff's breach of contract and estoppel claims. At the close of all evidence, the trial justice declined to instruct the jury on the law of punitive damages because he did not find any evidence to support them. The jury found defendant liable only for negligent misrepresentation. Finally, the trial justice dismissed plaintiff's remaining claims under Rule 50 because the jury found no evidence of any intentional misconduct on defendant's behalf.

The parties stipulated compensatory damages as $3,154.14 and therefore, the jury awarded plaintiff that amount. The plaintiff timely appealed and defendant filed a cross-appeal.

## II

### The Cross–Appeal

We choose to address defendant's cross-appeal first because it includes an attack on Superior Court jurisdiction. The defendant argues that the Superior Court should have granted its Rule 12(b)(1) motion because plaintiff's complaint failed to satisfy the requisite amount in controversy. Specifically, Minnesota Mutual argues that a claim for punitive damages cannot be used to satisfy the amount in controversy requirement.

Subject matter jurisdiction is an indispensable requisite in any judicial proceeding; it can be raised at any stage thereof either by the parties or by the court *sua sponte*, and it cannot be waived or conferred by consent of the parties. *Castellucci v. Castellucci*, 116 R.I. 101, 103, 352 A.2d 640, 642 (1976). We review an attack on subject matter jurisdiction *de novo*.

It is well-settled that as long as punitive damages are claimed in good faith, they are properly included for the calculation of the jurisdictional prerequisite. *See Carvalho v. Coletta*, 457 A.2d 614, 616 (R.I.1983). In this case, there is no evidence of bad faith on plaintiff's behalf, and therefore, the trial justice did not err. Even if punitive damages could not be included in the amount in controversy calculation, the fact that plaintiff had a demand for equitable relief made jurisdiction proper. Pursuant to § 8–2–13, "[t]he

[S]uperior [C]ourt shall, except as otherwise provided by law, have exclusive original jurisdiction of suits and proceedings of an equitable character and of statutory proceedings following the course of equity * * *." Also, pursuant to the Uniform Declaratory Judgments Act, G.L.1956 § 9–30–1, "[t]he [S]uperior or [F]amily [C]ourt upon petition, following such procedure as the court by general or special rules may prescribe, shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." Thus, Minnesota Mutual's cross-appeal on subject matter jurisdiction is denied.

The defendant also appeals the trial justice's decision to send the negligent misrepresentation claim to the jury. Specifically, defendant contends that the trial justice should have granted its Rule 50 motion on that claim. We agree.

■ When we review a decision on a Rule 50 motion, we, like the trial justice, examine:

"the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, and draw from the record all reasonable inferences that support the position of the nonmoving party. * * * If, after such a review, there remain factual issues upon which a reasonable person might draw different conclusions, the motion for [judgment as a matter of law] must be denied, and the issues must be submitted to the jury for determination." *Filippi v. Filippi*, 818 A.2d 608, 617 (R.I.2003) (quoting *Marketing Design Source, Inc. v. Pranda North America, Inc.*, 799 A.2d 267, 271 (R.I.2002)).

When there "are no relevant factual issues and 'defendant is entitled to judgment as a matter of law, then the trial justice should grant the motion and dismiss the complaint.'" *Filippi*, 818 A.2d at 617.

■ The plaintiff contended that, based on information given to her by Minnesota Mutual, she believed that she was entitled to a pro rata share of any dividends if she terminated Arthur's policy before the purchase anniversary date. To establish a prima facie case of negligent misrepresentation, the plaintiff must establish the following elements:

"(1) a misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity or must make the representation under circumstances in which he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation." *Mallette v. Children's Friend and Service*, 661 A.2d 67, 69 (R.I.1995) (quoting *Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882, 890 (1994)).

■ In this case, taking the evidence in the light most favorable to plaintiff, the trial justice should have found that defendant was entitled to judgment as a matter of law on this claim. The information plaintiff allegedly relied on is contained in the December 10, 1994 Annual Policy Review and the attachment to the conservation brochure. The policy language says that "[e]ach year, we determine if your policy will share in our divisible surplus. We call your share a dividend and credit it to you on your policy anniversary under one of the dividend options shown below." The December 10, 1994 statement showed that the cash value of the policy was $17,353, based upon an actual dividend of $4,421 for 1994. The literature attached to the conservation brochure read:

"At Minnesota Mutual, we believe you should get an up-to-date return on your

insurance dollars—no matter how long you've owned your policy. With Ultimate Interest™, our unique interest-crediting method, we credit current, competitive interest rates to each premium payment. That means every time you pay a premium, we credit it with an interest rate that reflects market conditions on the day we receive it. So you're always assured of earning current market rates."

These materials are not false or misleading when considered in context with the policy language. It is clear that the annual dividend is paid only on the purchase anniversary date.

More importantly, however, plaintiff could not have prevailed on the misrepresentation claims because the statement did not induce plaintiff to act on them in the manner that Minnesota Mutual intended. The statements were part of an attempt designed to retain plaintiff as an insured. The plaintiff, however, did exactly the opposite and switched insurance companies. There simply is no juxtaposition between plaintiff's act of switching insurance companies with defendant's issuance of the conservation statement, which was an attempt to persuade plaintiff to stay with Minnesota Mutual.[9] *See St. Paul Fire and Marine Insurance Co. v. Ellis & Ellis,* 262 F.3d 53, 62 (1st Cir.2001) (holding that to succeed on the issue of reliance, the plaintiff must determine that its reliance was substantially influenced by the defendant's misrepresentation and that such reliance

was of the type that the defendant intended); *see also* Restatement (Second) *Torts,* § 552 cmt. *a* at 128 (1977) ("one who relies upon information in connection with a commercial transaction may reasonably expect to hold the maker to a duty of care only in circumstances in which the maker was manifestly aware of the use to which the information was to be put and intended to supply it for that purpose").

It is clear that plaintiff already had made the decision to switch policies before defendant sent the conservation package. Furthermore, it is equally clear that the conservation package was not an attempt by defendant to influence plaintiff to switch insurance companies. Therefore, taking the facts in the light most favorable to plaintiff, the trial justice should have granted defendant's Rule 50 motion on the negligent misrepresentation claim. Consequently, we hereby vacate the jury verdict finding on negligent misrepresentation.[10]

## III

### The Motion *In Limine*

The plaintiff contends that the trial justice erred in ruling by way of a motion *in limine* that the insurance policy was unambiguous, thus effectively dismissing plaintiff's breach of contract claim by precluding any subsequent evidence related to the ambiguity of the terms of the contract.[11] We disagree.

---

**9.** If plaintiff had decided to remain with Minnesota Mutual in reliance on the conservation brochure and was later denied a dividend, there would be a sufficient connection between the representation and reliance to satisfy the third prong of *Mallette v. Children's Friend and Service,* 661 A.2d 67, 69 (R.I. 1995).

**10.** Although it may seem inconsistent to vacate the jury verdict on negligent misrepresentation without also vacating its verdict on

fraudulent misrepresentation, neither party appealed the trial justice's decision to send that claim to the jury. Therefore, we do not address fraudulent misrepresentation.

**11.** The trial justice technically dismissed plaintiff's claim as a matter of law after plaintiff presented her case, but plaintiff asserts that, for all intents and purposes, the trial justice effectively dismissed plaintiff's claim by its ruling on the motion *in limine.*

The motion *in limine* is "widely recognized as a salutary device to avoid the impact of unfairly prejudicial evidence upon the jury to save a significant amount of time at the trial." *Ferguson v. Marshall Contractors, Inc.*, 745 A.2d 147, 150 (R.I.2000) (quoting *Gendron v. Pawtucket Mutual Insurance Co.*, 409 A.2d 656, 659 (Me.1979)). Although motions *in limine* traditionally have been used to prevent prejudicial evidence from being presented at trial, they have developed into tools for narrowing the issues and enhancing the parties' preparation for trial. *Id.*

In this case, Minnesota Mutual moved via motion *in limine*, to exclude the Lee letter, evidence explaining the Ultimate Interest method and a manual issued after plaintiff initiated her lawsuit that clarified how to calculate cash value. The trial justice admitted those pieces of evidence. The trial justice also determined that the policy language was unambiguous. The plaintiff asserted that, as a result of that ruling, the trial justice refused to admit evidence at trial concerning the ambiguity of the contract terms. The plaintiff alleges that this contradicts our ruling in *BHG, Inc. v. F.A.F., Inc.*, 784 A.2d 884, 887–88 (R.I.2001).

In *BHG* we stated that when a trial justice is confronted with a motion *in limine* that has a potentially preclusive effect, he or she should carefully set forth the reasons for the order after allowing the parties to be heard on the terms of the contract and the alleged breach. *Id.* In this case, although there was no formal motion by either party for the trial justice to rule on the terms of the contract, plaintiff recognized that defendant had argued in the motion *in limine* that the contract was unambiguous. The plaintiff acknowledged that the trial justice could rule on the construction of the contract in the motions *in limine*, but indicated that the better course of action would be to reserve decision until after the close of plaintiff's evidence. The plaintiff then proceeded to make her case that the contract was ambiguous. After hearing from both sides, the trial justice issued his ruling. Furthermore, unlike the situation in *BHG*, the trial justice fully articulated his reasoning for ruling that the policy language was unambiguous. Therefore, the trial justice's actions did not run afoul of our ruling in *BHG*.

Nevertheless, this Court reviews the trial justice's interpretation of contracts *de novo*. *Lerner v. Ursillo*, 765 A.2d 1212, 1217 (R.I.2001). Therefore, we will reverse the trial justice's determination if we conclude that it is incorrect.

When "interpreting the contested terms of [an] insurance policy, we are bound by the rules established for the construction of contracts generally." *Malo v. Aetna Casualty and Surety Co.*, 459 A.2d 954, 956 (R.I.1983). The terms used must be given their plain and ordinary meaning, and the test to be applied is not what the insurer intended, but what the ordinary reader and purchaser would understand them to mean. *See Campbell v. Norfolk & Dedham Mutual Fire Insurance Co.*, 682 A.2d 933, 935 (R.I.1996). "We have consistently held that a contract is ambiguous only when it is reasonably and clearly susceptible of more than one interpretation." *Rotelli v. Catanzaro*, 686 A.2d 91, 94 (R.I.1996). If the terms are found to be unambiguous, however, the task of judicial construction is at an end and the parties are bound by the plain and ordinary meaning of the terms of the contract. *Malo*, 459 A.2d at 956.

The policy language in this case is clear. It states that "[e]ach year, we determine if the policy will share in our divisible surplus. We call your share a dividend and credit it to you on your policy anniversary [date] under one of the dividend options shown below." We agree

with the trial justice that there is only one way of interpreting that language; that the policy pays dividends, if at all, only on the anniversary date. Certainly an ordinary purchaser and policyholder would understand that the words "credit [the dividend] to you on your policy anniversary" mean credit the dividend on your policy anniversary. Therefore, given that the terms are unambiguous, no evidence can be admitted to contradict those terms. *See id.*

Given our interpretation of the Adjustable III Life Insurance Policy, we conclude that the trial justice did not err in concluding that the contract was unambiguous.

## IV

### Claims Dismissed via Judgment as a Matter of Law

The plaintiff next argues that the trial justice erred by granting Minnesota Mutual's Rule 50 motion on equitable estoppel, breach of the duty of good faith and fair dealing, bad faith, G.L.1956 § 7–15–2 of the Rhode Island RICO act, § 9–1–2 and punitive damages. We disagree.

### A

### Equitable Estoppel

"The doctrine of estoppel is an equitable doctrine that will operate to bar a person from denying liability when the party makes 'a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance * * * [and] injustice can be avoided only by enforcement of the promise.'" *General Accident Insurance Co. of America v. American Na-*

*tional Fireproofing, Inc.,* 716 A.2d 751, 755 (R.I.1998) (quoting *Criterion Leasing Group v. Gulf Coast Plastering & Drywall,* 582 So.2d 799, 800 (Fla.Dist.Ct.App. 1991)). "In the context of insurance coverage the insured must show '(1) that he was misled by the acts or statements of the insurer or its agent; (2) reliance by the insured on those representations; (3) that such reliance was reasonable; and (4) detriment or prejudice suffered by the insured based on the reliance.'" *Id.* (quoting *Dumenric v. Union Oil Co. of California,* 238 Ill.App.3d 208, 179 Ill.Dec. 398, 606 N.E.2d 230, 233 (1992)). The court, however, may not invoke the doctrine of equitable estoppel to expand the scope of coverage of an insurance policy. *Id.* Additionally, quasi-contractual remedies such as equitable estoppel are inapplicable when the parties are bound by an express contract. *See JN Exploration & Production v. Western Gas Resources, Inc.,* 153 F.3d 906, 910 (8th Cir.1998) (interpreting North Dakota law); *Hodgkins v. New England Telephone Co.,* 82 F.3d 1226, 1232 (1st Cir.1996) (interpreting Maine law); *Cloverdale Equipment Co. v. Simon Aerials, Inc.,* 869 F.2d 934, 939 (6th Cir.1989) (interpreting Michigan Law); *Hershey Foods Corp. v. Ralph Chapek, Inc.,* 828 F.2d 989, 999 (3d Cir. 1987) (interpreting Pennsylvania law).

In this case, the trial justice held that the doctrine of equitable estoppel did not apply because plaintiff and defendant had an express, unambiguous insurance contract. Because the doctrine of equitable estoppel shall not apply to unambiguous contracts or to enlarge the scope of insurance benefits,[12] there are no set of facts under which plaintiff could prevail on this theory.[13] Thus, we affirm the trial

---

12. Although this case did not concern the traditional benefit provided by an insurance policy—death benefits—the interest and dividend certainly were benefits provided by the policy and thus appropriately are considered part of the policy's coverage.

13. The plaintiff also contends that fraud and estoppel are the same claim, and that it would

justice's decision to grant defendant's Rule 50 motion on equitable estoppel.

## B

### Breach of Duty of Good Faith and Fair Dealing

█ The plaintiff also asserts that the trial justice erred in dismissing her claim of breach of the common law duty of good faith and fair dealing. Under Rhode Island law, however, a plaintiff first must show that he or she is entitled to recover on the contract before he or she can prove that the insurer dealt with him or her in bad faith. *See Bartlett v. John Hancock Mutual Life Insurance Co.*, 538 A.2d 997, 1000 (R.I.1988). Because we conclude that the trial justice properly dismissed plaintiff's breach of contract claim, her breach of good faith and fair dealing claim similarly is without merit.

## C

### Common Law Bad Faith

█ The plaintiff also contends that the trial justice should have submitted her common law bad-faith claim to the jury. To succeed on a common law bad-faith claim in Rhode Island, a plaintiff must

demonstrate the absence of a reasonable basis for denying the policy benefits and that defendant had knowledge or recklessly disregarded the lack of a reasonable basis for denying the claim. *See Skaling v. Aetna Insurance Co.*, 799 A.2d 997, 1004 (R.I.2002). The plaintiff could not prevail on this claim for one simple reason: there is a reasonable basis for defendant to deny plaintiff a pro rata share of the annual dividend. The policy clearly states that an award of a dividend is paid, if at all, only on the policy anniversary date. Therefore, the trial justice correctly decided that plaintiff's bad-faith claim failed as a matter of law.

## D

### Civil Liability under § 9–1–2 and RICO

█ To establish liability under both § 9–1–2 [14] and RICO,[15] a plaintiff must first establish that defendant engaged in criminal activity. In this case, the jury found that Minnesota Mutual had not engaged in such activity. Based on this finding of fact, plaintiff could not prevail on the § 9–1–2 and RICO claims. Thus,

make no sense to grant judgment as a matter of law on the equitable estoppel claim but not on the fraud claim. The plaintiff is incorrect in this assertion. Equitable estoppel is an equitable device that is applied, if at all, by the trial justice. *See General Accident Insurance Co. of America v. American National Fireproofing, Inc.*, 716 A.2d 751, 755 (R.I. 1998). Conversely, fraud is a legal claim in which the jury decides whether plaintiff is entitled to damages based upon findings of fact. *See Probate Court of Westerly v. Potter*, 26 R.I. 202, 203, 58 A. 661, 661–62 (1904). Therefore, plaintiff's claim that a denial of equitable estoppel could only have logically occurred if the trial justice also dismissed the fraud claim is a *non sequitur*.

14. General Laws 1956 § 9–1–2 provides that: "Whenever any person shall suffer any injury to his or her person, reputation, or estate

by reason of the commission of any crime or offense, he or she may recover his or her damages for the injury in a civil action against the offender, and it shall not be any defense to such action that no criminal complaint for the crime or offense has been made; and whenever any person shall be guilty of larceny, he or she shall be liable to the owner of the money or articles taken for twice the value thereof, unless the money or articles are restored, and for the value thereof in case of restoration."

15. General Laws 1956 § 7–15–2(b) provides that, "[i]t is unlawful for any person through a racketeering activity or through collection of an unlawful debt to directly or indirectly acquire or maintain any interest in or control of any enterprise."

there was no need to hold the second part of the bifurcated trial.

### E

### Punitive Damages

 The punitive damage claim also was properly dismissed. "The nature of punitive or exemplary damages is twofold: to punish the tortfeasor whose wrongful conduct was malicious or intentional and to deter him or her and others from similar extreme conduct." *Palmisano v. Toth,* 624 A.2d 314, 317–18 (R.I.1993). "[T]he party seeking punitive damages has the burden of producing 'evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amount[s] to criminality, which for the good of society and warning to the individual, ought to be punished.'" *Id.* (quoting *Sherman v. McDermott,* 114 R.I. 107, 109, 329 A.2d 195, 196 (1974)).

 The trial justice declined to send the issue of punitive damages to the jury because there was no evidence that defendant acted willfully, recklessly or wickedly. Therefore, the trial justice was correct in granting defendant's Rule 50 motion for judgment as a matter of law on plaintiff's claim for punitive damages.

### V

### Class Action Certification

 The plaintiff next argues that the hearing justice should have certified the action pursuant to Rule 23 of the Superior Court Rules of Civil Procedure. We review decisions whether to certify under Rule 23 in the same manner as we review findings of fact made by a trial justice sitting without a jury. *See Cabana v. Littler,* 612 A.2d 678, 685 (R.I.1992). The Rule 23 determination is accorded great deference and will not be disturbed unless the trial justice misconceived material evidence. *See Cabana,* 612 A.2d at 685.

"The class action provides an exception to the traditional confrontation between a plaintiff and a defendant by allowing the named-class plaintiff or named-class defendant to represent interests of others with similar claims who are absent from the court." *Id.* at 684. The plaintiff avers that the hearing justice erred in not certifying this case as a Rule 23 class action. We disagree and affirm the hearing justice's ruling.

 After the hearing justice in this case correctly determined that plaintiff's motion for certification met the timeliness requirement of Rule 23(c)(1),[16] he

---

**16.** Although defendant does not contest the timeliness of plaintiff's Super. R. Civ. P. 23 motion, we believe some discussion on the topic is necessary. In *Cabana v. Littler,* 612 A.2d 678, 686 (R.I.1992), we concluded that the plaintiff asking for Rule 23 certification had not satisfied the timing requirement of subsection (c)(1) because eight-and-one-half years elapsed from the time of the filing of the complaint until the filing of the Rule 23 motion. We did not intend for *Cabana* to mean that eight-and-one-half years is automatically untimely. Each review depends on the facts and circumstances of the case.

Additionally, because Rhode Island Rule 23 is a carbon copy of Rule 23 of the Federal Rules of Civil Procedure, we look to federal law for aid in interpreting Rule 23. *See Ciunci, Inc. v. Logan,* 652 A.2d 961, 962 (R.I.

1995). The federal cases on Rule 23(c)(1) have explicitly stated that "[a]lthough the words 'as soon as practicable' are not without effect, 'there is no set deadline by which the court must act.'" *Ayuda, Inc. v. Reno,* 7 F.3d 246, 253 (D.C.Cir.1993) (quoting *Montelongo v. Meese,* 803 F.2d 1341, 1351 (5th Cir.1986)); *see also Larionoff v. United States,* 533 F.2d 1167, 1183 n. 40 (D.C.Cir.1976); *Polich v. Burlington Northern, Inc.,* 116 F.R.D. 258, 260 (D.Mont.1987).

The hearing justice in this case correctly concluded that plaintiff fulfilled the timing requirement of Rule 23(c)(1) because, although she did not seek class certification until almost two years after the suit was initiated, the delay was caused by procedural issues that were resolved only shortly before she sought certification. Additionally, plaintiff made her motion for certification within

proceeded to decide whether the particular matter met the requirements of Rule 23(a) and (b). *See Cabana,* 612 A.2d at 685. We now turn to the determinations made during the hearing.

## A

## Predominance

At the hearing, the party seeking the class action certification first bears the burden of showing that, pursuant to Rule 23(a):

"(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

Provided that the party pleading a class action meets those threshold requirements, a class action also must qualify under one of the three subsections of Rule 23(b). *See Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 2245, 138 L.Ed.2d 689, 707 (1997). In this case, plaintiff attempted to have the action certified under subsection (b)(3) of Rule 23. Pursuant to Rule 23(b)(3) the court must find: ⌒

"that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

The hearing justice denied plaintiff's motion because her claim failed to meet the requirements of Rule 23(b).

Specifically, the hearing justice cited the following three reasons why common questions of fact or law did not predominate over the individual claims: (1) the insurance policies were sold by individual agents who did not follow a canned script, but rather sold the policies in a way that was inherently individualized, (2) questions of individual instances of reliance on the part of different members of the class weighed against predominance, and (3) differences in state law made certification problematic. We address each of the hearing justice's findings *seriatim.*

■ The United States Supreme Court has stated that the predominance inquiry of Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc.,* 521 U.S. at 623, 117 S.Ct. at 2249, 138 L.Ed.2d at 713. When there are a great number of significant, fact-specific questions that are unique to individual parties of the class, instead of questions that are common to the class as a whole, there is no predominance under Rule 23(b). *See Amchem Products, Inc.,* 521 U.S. at 622–24, 117 S.Ct. at 2249–51, 138 L.Ed.2d at 712–13.

There is ample authority in the federal courts, however, to certify a class when a plaintiff alleges that a defendant has engaged in a systematic, common course of conduct. *See In re The Prudential Insurance Co. of America Sales and Practices Litigation,* 962 F.Supp. 450, 511 (D.N.J. 1997) (holding that because the defendant insurance company implemented a specific training program designed to create uniform sales criteria for all agents, and when all oral misrepresentations resulting from that uniform training were essentially the same, there was sufficient predomination of common claims to certify the class); *Duhaime v. John Hancock Mutual Life Insurance Co.,* 177 F.R.D. 54, 65 (D.Mass. 1997) (holding that class certification was

the time frame that the original hearing justice directed.

appropriate when insurance agents fraudulently had induced sales of policies pursuant to a common scheme implemented by the home office); *Seidman v. American Mobile Systems, Inc.*, 157 F.R.D. 354, 366 (E.D.Pa.1994) (finding that certification was appropriate when corporation, CEO and accountant engaged in a continuing course of action that failed to disclose unauthorized transfers of money). Conversely, federal courts have held that predominance is not satisfied when class members' claims originate from non-uniform oral representations. *See In re Jackson National Life Insurance Company Premium Litigation*, 183 F.R.D. 217 (W.D.Mich.1998); *Peoples v. American Fidelity Life Insurance Co.*, 176 F.R.D. 637 (N.D.Fla.1998).

■ The hearing justice in this case found that approximately 180,000 Adjustable III policies were sold by more than 7,000 agents in forty-nine states and the District of Columbia. Furthermore, agents that sell these policies are considered independent contractors and do not use canned scripts for the sale or surrender of the policy. Rather, the agents use their own, unique methods in dealing with the customers. Therefore, the hearing justice determined that plaintiff failed to demonstrate that a common scheme was used by Minnesota Mutual to misrepresent or induce customers into buying or surrendering these policies. Additionally, the hearing justice determined that the presence of individual questions of reliance in negligent misrepresentation, fraudulent misrepresentation and equitable estoppel claims further weighed against finding predominance.

■ Finally, the hearing justice rejected plaintiff's contention that choice of law principles required that Minnesota contract law apply to the case, and conclu-

sively determined that the differences in state law undermined any potential predominance. Indeed, it is the responsibility of the hearing justice to determine whether variations in different state laws defeat predominance. *See Castano v. The American Tobacco Co.*, 84 F.3d 734, 740 (5th Cir.1996). To aid in this task, the proponent of class certification has the burden of providing a detailed survey of state law variations to determine whether these disparities defeat predominance. *See In re Ford Motor Co. Ignition Switch Products Liability Litigation*, 174 F.R.D. 332, 349 (D.N.J.1997). When the discrepancies in the laws are substantial, class certification will not be appropriate. *See id.*

In this case, plaintiff submitted two affidavits from legal scholars providing a thorough analysis of the laws of the fifty states in the areas of breach of contract, fraud, negligent misrepresentation, unjust enrichment/constructive trust, negligence, the breach of the duty of good faith and fair dealing, and punitive damages. The defendant contested that there were various differences in those areas of law among the fifty states and presented a list of all fifty states' different statutes of limitations and burdens of proof accompanied by affidavit. After examining those documents, the hearing justice concluded that certification would be problematic because of the potential for variations in the laws governing individual class members' claims.

Specifically, the hearing justice noted that, because Rhode Island still follows the First Restatement approach to choice of law issues involving contracts, individual class members' claims would be governed by the law in the location where the contract was executed. Moreover, the hearing justice determined that plaintiff had not adequately addressed differences from state to state in the law of fraud, statutes of limitations and burdens of proof,[17] and

**17.** The plaintiff never provided a state-by- state analysis on the law of estoppel.

therefore, her case was inappropriate for class certification.

It is clear from his written decision that the hearing justice carefully considered all the evidence relevant to class certification and concluded, on the basis of that evidence, that plaintiff was unable to demonstrate that common questions of fact or law predominated over questions unique to individual class members.

 The plaintiff contends that the hearing justice inappropriately sidestepped the Rule 23(a) analysis before moving to Rule 23(b). It is immaterial, however, that the hearing justice relied only on subsection (b) to deny certification because plaintiff could not proceed unless both prongs were satisfied. Additionally, plaintiff argues that the hearing justice erred in looking to the substantive claims to make his decision on certification. "In order to make the findings required to certify a class action under Rule 23(b)(3) * * * one must initially identify the substantive law issues which will control the outcome of the litigation." *Castano,* 84 F.3d at 741 (quoting *Alabama v. Blue Bird Body Co.,* 573 F.2d 309, 316 (5th Cir.1978)). This is exactly what the hearing justice did. He did not decide substantive issues, rather he simply examined them for the purpose of determining the issue of predomination. Thus, we conclude that the hearing justice did not misconceive material evidence nor was he clearly wrong in his application of the law. We affirm his decision not to certify plaintiff's case as a class action.

### B

### Superiority

Even if the hearing justice erroneously determined that questions of law and fact common to the potential class as a whole did not predominate over questions of law and fact unique to individual class members, the decision not to certify the action was still correct because it is not the superior method of litigation for this matter.

 As stated previously, in addition to predominance, the litigant must demonstrate "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3). To make the determination of superiority the hearing justice must consider:

"(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a classification." *Id.*

Rule 23(b)(3)(D), which commonly is referred to as "manageability," is a consideration that "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 164, 94 S.Ct. 2140, 2146, 40 L.Ed.2d 732, 741 (1974). Furthermore, individual inquiries into alleged misrepresentations and subsequent reliance present insurmountable difficulties in the manageability of potential class actions, thus defeating the superiority of a class action. *See Johnston v. HBO Film Management, Inc.,* 265 F.3d 178, 194 (3d Cir.2001). Additionally, when there is a need to inquire into facts that are specific to individual class members, and consider those facts in the context of varying state laws, the problems inherent in managing such a case defeats the superiority of certifying it as a class action. *See Zinser v. Accufix Research Institute, Inc.,* 253 F.3d 1180, 1192 (9th Cir.2001). Thus, "if more than a few

of the laws of the fifty states differ" the class action is not the superior method of resolution. *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1085 (6th Cir. 1996).

██ In this case, the hearing justice determined that, because of individual questions about misrepresentation and reliance as well as variance in state laws on burden of proof and statute of limitation, the class action was not a superior method of resolving this case. In making his determination, it is apparent that the hearing justice did not overlook or misconceive any evidence, nor was he clearly wrong in his application of the law. Rather, he adequately perused all the evidence and clearly explained his ruling in writing.

### Conclusion

The plaintiff's appeal is denied and dismissed. We affirm the judgment of the Superior Court denying class certification and granting the defendant's Rule 50 motions on breach of contract, equitable estoppel, breach of the duty of good faith and fair dealing, bad faith, § 7–15–2 of the RICO Act, § 9–1–2 and punitive damages. We grant the defendant's cross-appeal, reverse the judgment of the Superior Court denying the defendant's Rule 50 motion on the negligent misrepresentation claim and vacate the jury's verdict. The papers of this case may be returned to the Superior Court.

Justice FLANDERS did not participate.