Stanley W. GALE,

v.

VALUE LINE, INC.

Civ. A. No. 85–0655 B.

United States District Court,
D. Rhode Island.

July 24, 1986.

R. Kelly Sheridan, Providence, R.I., for plaintiff.

Deming E. Sherman, Providence, R.I., for defendant.

## OPINION

FRANCIS J. BOYLE, Chief Judge.

The plaintiff, Stanley W. Gale is not only a law school graduate and a practicing psychiatrist, but, he has also been a successful investor in convertible securities. Indeed, he claims to have found the foolproof profitable investment, with high profits and practically no risk. The fact that this litigation is brought is some proof of the maxim attributed to one Murphy, that what can go wrong, will.

Plaintiff spends about five hours a week tending to his investments. His method is his own creation and he says it works. It operates as follows. Plaintiff selects warrants or stock options which he considers are overvalued. A warrant is overvalued if it carries a high premium. A warrant is a right to purchase stock, usually common, at a stated price within a specified period of time, usually years. Its investment value is that it is usually sold to be exercized at a price above the then market value of the stock and if, over time, the stock increases in market value, it will yield a substantially higher percentage of profit

than would a present purchase of the stock itself held to the same later date. Additionally, a warrant may have an intrinsic value which is the premium. Premium is the amount the market is attributing to the prospect that the stock will increase in value, and usually increases at a greater rate than the value of the stock.

It is essential to the plaintiffs investment plan that the transaction be "covered," that is, that he has sold call options on the same stock which will expire before the stock warrants expire and that both the sale and purchase involve the same number of shares. This process has been referred to as "hedging." Its purpose is to reduce the risk to "almost none."

Plaintiff was a sporadic subscriber to one of the defendants publications called "Value Line Convertibles." Four issues of the publication are distributed to subscribers each month. It was circulated to between 2200 and 4400 subscribers in the period February, 1983 to April, 1985. The publication ranks convertible securities and includes purchase recommendations. It also includes an evaluation of warrants. Included in the evaluation is information concerning the warrant price and in footnotes further information including usually, if applicable, the fact that the warrant expiration date may be accelerated under certain conditions.

This litigation involves three transactions in warrants of Trans World Airlines. In 1979, Trans World Corporation offered subordinate debentures with warrants to purchase 2,790,000 shares of common stock. The warrant entitled the holder to purchase one share of Trans World common stock for $31.00. The warrants expired by their terms on October 1, 1986, except that Trans World had the right to accelerate the expiration date of the warrants to a date as early as October 1, 1984 by 60 days notice to the warrant agent and registered holders of the warrants if the common stock shall have had a closing market price of not less than 125% of the then current warrant exercise price for a period of 45 consecutive trading days ending not more than 10 calendar days immediately prior to the date of such notice. Although it was Value Lines practice to notify subscribers of a right to accelerate on the part of the issuing corporation in a footnote, it failed for a time to do so and it is this failure which prompts this litigation.

Plaintiff purchased 2000 warrants of Trans World between April 18, and May 2, 1984 to cover 20 calls for Trans World Stock at $25 due December, 1984. Each call is an option to buy 100 shares. In a second series of transactions, plaintiff sold 20 calls at $25.00 per share between August 7 and August 17, 1984 and bought 2000 warrants within the same time period. The calls were due in March, 1985. In a third transaction, plaintiff sold 35 calls at $25.00 per share due in June 1985 and purchased 3500 warrants between September 24, and October 1, 1984.

Thus, on October 1, 1984 plaintiff owned 7500 warrants of Trans World and was indebted to 75 calls of one hundred shares each of Trans World common stock. He paid $82,229.34 for the warrants and received $44,284.30 for the calls. He thus had rights to purchase 7500 shares of common stock of Trans World Corporation at $31.00 per share and the obligation to deliver 7500 shares of Trans World Corporation at $25.00 per share.

On October 3, 1984, after the close of the market, Trans World accelerated the expiration date from October 1, 1986 to December 3, 1984 because the conditions permitting acceleration had occurred. This action brought a sharper focus on plaintiff's warrants to purchase common stock at $31.00 per share and his obligation to provide the same stock at $25.00 per share. The difference between the two prices and the then market price was not sufficient to be profitable.

Plaintiff argues that he relied between April 18, 1984 and October 1, 1984 on the accuracy of the defendant's publication, which did not inform him during that time of the right of Trans World to accelerate the warrants, believing that they would not expire until October 1, 1986 and therefore

would survive the calls which he had sold. He contends that defendant breached its contract with plaintiff and further that defendant is guilty of negligent misrepresentation. Defendant contends that its contractual relationship with plaintiff has not been breached, that it has made no misrepresentation and further that plaintiff is barred by its disclaimer.

Each edition of the publication bears on the front page at the bottom: "Factual material is obtained from sources believed to be reliable but cannot be guaranteed." This statement is printed in type about ⅛ inch in height but only slightly smaller than the type used in the body and footnotes of the publication. Plaintiff admits to having read and understood its meaning. Plaintiff contends that the disclaimer is too small in size and that it applies to errors of others providing information to defendant, while in this instance defendant had available to it the correct information but failed to publish it.

The parties are also far apart on the issue of damages. Plaintiff purchased 7500 warrants for $82,229.37 and sold 75 calls for $44,284.30, a transaction which required him to invest $37,945.07 of his own funds. He has reconstructed the transaction as if the acceleration provision was not included as a term of the warrant and concludes that he would have profited in the amount of $25,835.31, which he seeks as damages. Plaintiff's actual out of pocket loss was, according to plaintiff, $6,519.96. He in August, 1984 had achieved a profit on paper totalling $4,907.00 which he claims in addition, if the appropriate measure of damages is his out of pocket loss. Defendant calculates the out-of-pocket loss on a more conservative basis and arrives at a total of $5,136.00.

■ There is merit to the plaintiff's argument that the so-called disclaimer does not carry the day for the defendant. The statement is: "Factual material is obtained from sources believed to be reliable but cannot be guaranteed." Plaintiff contends that the purpose of this statement is to protect defendant from the errors of oth-

ers. Read literally, as it must be, plaintiff is quite correct. Had the defendant wished to protect itself from its own errors as occurred in this instance, it could have said it so much more clearly, for example: "The publisher is not responsible for any errors or omissions." Contrasted in this light, the so-called disclaimer is not adequate to insulate defendant from liability.

The essential issue is, is the omission either a breach of contract or negligence.

■ Plaintiff has pointed to no language in any of the solicitations by defendant for subscriptions under which defendant assumes the responsibility of 100% accuracy. There is no assurance or guarantee that the publisher, among the myriad of detail to be reported, will not somehow make a mistake as occurred in this instance. Indeed, plaintiff was satisfied that the defendant had made a mistake in its recommendations since he acted contrary to defendant's recommendation against the use of Trans World warrants in a hedged transaction. Plaintiff understandably testified that he used the defendant's publication only for the purpose of getting the essential terms of the warrants and "any term changes." At the same time, the obvious principal thrust of the publication is to make recommendations to potential investors, a purpose which plaintiff abjured.

In short, there is no expressed contract to be breached as a basis for the plaintiffs action. Nor is there any implied agreement. Plaintiff can point to no circumstances which impose a particular duty upon the defendant as a matter of law, hence no implied contractual remedy is available to plaintiff.

■ Plaintiff also argues that defendant was negligent. Plaintiff's theory is that the doctrine of negligent misrepresentation applies. Plaintiff urges that this action is controlled by Restatement of the Law of Torts 2d (1977) § 552 relating to information negligently supplied for the guidance of others. This doctrine requires that the party who supplies information must first

fail to exercise reasonable care or competence in communicating the information.

Restatement of Torts § 552 provides

§ 552. Information Negligently Supplied for the Guidance of Others.

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

■ The basic rule can be paraphrased to read that one who is paid for the information furnished and who supplies false information for the guidance of others in their business transactions is subject to liability to those who justifiably rely on the information if reasonable care and competence was not exercised.

■ The Restatement does not expressly refer to an omission such as is in issue in this action. All of the statements which were made are true. The presentation is incorrect in that there was a failure to provide complete information. Without the complete information, of course, the representation that the Trans World warrants would not expire until October 1, 1986 is incorrect. The information which was omitted was the fact that the expiration date could be accelerated by Trans World Corporation given the appropriate market conditions.

There are a number of insurmountable obstacles to the plaintiff's success.

■ First, is the requirement that the plaintiff prove that the defendant did not exercise reasonable care. The evidence is that although the defendant had a copy of the Trans World Corporation prospectus in connection with the offer of subordinate debentures and although the fact that the warrant could be accelerated to "as early as October 1, 1984" appears on page 1 of the prospectus and is explained at length at page 62, the fact is that the information was simply and inadvertently omitted from the publication for a period of time. The plaintiff would hold the defendant to a duty of complete accuracy with respect to every detail of its publication. Although the footnote was missing for a period of time, the defendant recommended, at the times that the plaintiff made his purchases of Trans World warrants, that they not be used in the type of transaction in which plaintiff was involved. Plaintiff seeks to distinguish his claim on the basis that he sought only the detailed information provided by the defendant's service and chose to ignore the recommendations of the defendant. This, indeed, is much too high a standard to apply to any communicator. Plaintiff would require the defendant to abide by his standard of adopting as gospel some of the information furnished and rejecting as unreliable a contrary recommendation. The essential thrust of the defendant's communication is investment recommendations. It is inappropriate to impose a duty which permits the recipient of information to take part of the information and ignore the remainder. The application of this extraordinary duty to those who peddle commercial information would bring the business of information distribution to a standstill. Furthermore, the imposition of a duty that required absolute and completely correct information as to every detail, including the requirement that nothing be left out would establish an intolerable and probably unachievable standard of conduct.

Plaintiff chose to ignore defendants lack of endorsement without hesitation. Any prudent investor would have at least hesitated and made some effort to find out why the issue was not recommended. The evidence was that defendant did not recommend the issue because it would not be "profitable."

Plaintiff's claim for damages also confronts some considerable obstacles. Plaintiff relies heavily upon Restatement of Torts 2d § 552. However, when it comes to the matter of damages, plaintiff shifts to a theory similar to a contract theory of damages. Plaintiff seeks to obtain the profits which would have accrued to him had the transaction gone according to his plan. Thus, in connection with a transaction in which the plaintiff had invested $37,945.07 he expected a profit of $25,835.31.

However, under Restatement of Torts 2d § 552B(b) this theory of damages is expressly rejected. Section 552B(b) of the Restatement limits damages to pecuniary loss suffered. The measure of damages claimed by the plaintiff might be applied in an instance where a party had been deliberately defrauded but it has no place in a action founded upon, at best, negligence.

The plaintiff also seeks solace from the provisions of the Rhode Island Deceptive Trade Practices Act, R.I.Gen.Laws § 6–13.1–1, et seq. There is a serious question whether these transactions are even included within the ambit of the Act. Section 6–13.1–4 exempts "actions or transactions" permitted under laws administered by any regulatory body of the United States. Furthermore, the Act has not been construed to include a claim of negligent misrepresentation. All of the evidence in this action points to an unintentional error on the part of the defendant in the omission of some information and a recommendation at the same time that the warrants not be purchased. This circumstance can hardly be said to approach the nature of the acts proscribed by the Rhode Island statute.

Plaintiff also amended his complaint to assert a claim of res ipsa loquitur. Of course, in order to establish the application of the doctrine, there must be inherent in the circumstances obvious negligence. As appears above such is not the case. Further, plaintiffs failure to argue this doctrine is more than adequate reason for the court not to tarry further.

Judgment will enter for the defendant for costs.[1]

---

1. That this opinion is totally devoid of a citation to a decided case is not due to lack of effort. Neither party has cited an applicable court opinion and the court, in its independent research, has not found one. Citations to support generally accepted legal principles would do nothing but add to the length of this opinion.