LIFESPAN/PHYSICIANS PROFESSIONAL SERVICES ORGANIZATION, INC., Plaintiff,

v.

COMBINED INSURANCE COMPANY OF AMERICA and Aon Risk Services of Massachusetts, Inc., Defendants.

No. C.A. 02–175L.

United States District Court, D. Rhode Island.

Nov. 17, 2004.

---

Jeffrey S. Brenner, Linn F. Freedman, Nixon Peabody LLP, Providence, RI, for Plaintiff.

Anthony F. Demarco, Boyer, Reynolds & Demarco, Ltd., Benjamin V. White, Howard A. Merten, Vetter & White, Incorporated, Providence, RI, Scott J. Tucker, Richard E. Heifetz, Danielle M. Maloney, Tucker, Heifetz & Saltzman, Michelle E. Leinbach, Joseph G. Blute, John Stephan, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, Rosemary M. Allen, for Defendants.

## DECISION AND ORDER

LAGUEUX, Senior District Judge.

This case is before the Court on cross motions for partial summary judgment. The dispute involves the amount payable under a "stop loss" insurance policy, which in turn depends on the proper interpretation in the language of the policy. The parties to this litigation are the insured, Plaintiff Lifespan/Physicians Professional Services Organization, Inc., (hereinafter "PSO"); the insurance broker, Defendant Aon Risk Services of Massachusetts, Inc., (hereinafter "Aon Mass"); and the insurance company, Defendant Combined Insurance Company of America (hereinafter "Combined"). When the payment received by PSO pursuant to the policy turned out to be much smaller than it had anticipated, it filed this lawsuit, sounding in eight counts. All three parties filed motions for partial summary judgment. PSO moves for summary judgment on Counts I and II, and requests that the Court interpret the policy. Aon Mass moves for summary judgment on Counts II, IV, VII, and VIII. Combined also seeks to have the Court construe the language of the policy, and moves for summary judgment on Counts I, III, and V. In addition, Combined has requested that the Court refer the matter

to an independent auditor to make the calculations under the policy. No party has moved for summary judgment on Count VI of the operative complaint.

For the reasons that follow, the Court determines that Aon Mass is entitled to summary judgment on Counts II, IV and VII of the Amended Verified Complaint, and Combined is entitled to summary judgment on Count V. Both the motions of PSO and Combined on Counts I and II are denied, as is Aon Mass' motion on Count VIII. Furthermore, the Court concludes that the language of the insurance policy is ambiguous and that further evidence needs to be presented at trial to determine its meaning. Because a trial is necessary to determine the proper interpretation of the language of the insurance policy, Combined's motion to have the matter turned over to an independent auditor is premature, and is denied.

## Background

Plaintiff PSO is a non-profit Rhode Island corporation made up of three hospitals and three membership entities, which include over eight hundred physicians. On March 1, 1999, PSO signed a contract with Coordinated Health Partners, Inc., d/b/a BlueCHiP ("Bluechip"), which, *inter alia,* allocated the potential financial risk resulting from PSO providing hospital and physician services to Bluechip patient/subscribers. In this so-called "risk contract," Bluechip set limits on the amount (or "capitated" the amount) it would pay PSO for medical services provided to Bluechip subscribers, some of whom are Medicare and Medicaid recipients. If a Bluechip subscriber required medical care that exceeded the limit set by Bluechip, then PSO had to absorb those excess costs.

To insure itself against the risk of those kinds of catastrophic medical costs, and because it was required to do so by federal Medicare regulations, PSO sought reinsur-

ance, a new form known in the industry as "stop loss" insurance, prior to entering into the Bluechip contract. PSO contacted Aon Risk Services of Rhode Island, Inc. ("Aon RI"), a licensed insurance broker with which PSO's affiliate Lifespan Corporation had previously done business. Explaining that it did not have the expertise to broker a "stop loss" insurance policy, Aon RI, in turn, referred PSO to its affiliate Defendant Aon Mass.

In early 1998, Aon Mass agreed to serve as PSO's broker to secure a "stop loss" policy, and proceeded to solicit offers from insurance companies offering this type of reinsurance coverage. Several proposals were presented to PSO during a series of meetings that took place over close to a year at which various aspects of this complex coverage were explained by Aon Mass personnel, most notably Senior Vice President Berni Bussell, to PSO's Chief Operating Officer, William Beyer. During this time, Beyer reviewed a specimen insurance policy provided by Combined.

In the spring of 1999, PSO zeroed in on the policy offered by Defendant Combined, and in April 1999 Beyer signed an Insurance Binder for Combined's "stop loss" coverage. The policy was drafted to cover services provided by PSO over a year-long period from March 1, 1999, to March 1, 2000.

## The stop-loss policy

The policy provided PSO with two types of coverage: Specific Excess of Loss coverage and Aggregate Excess of Loss coverage. The Specific Excess of Loss coverage was fairly simple, and, with the exception of some disputed charges, the parties are in agreement as to its basic operation. For this coverage, a per-patient limit was set for doctors' services ($17,000) and one for hospital services ($75,000). All eligible costs incurred by

PSO over these limits were to be reimbursed by Combined at a rate of ninety per cent.

A distinguishing feature of the Combined policy—and the one that has caused the major headaches for the parties to this dispute—is the Aggregate Excess of Loss provision. Under this provision, all eligible costs ("Billed Charges for Eligible Services") are added together or "aggregated." A separate calculation is then undertaken to arrive at an "Aggregate Attachment Point," as follows: the number of Bluechip subscribers in the underlying risk contract is multiplied by a factor provided in the policy (one for commercial patients and one for Medicare/Medicaid patients). The Aggregate Attachment Point is then subtracted from the aggregated eligible charges. All eligible charges exceeding the Aggregate Attachment Point are to be reimbursed by Combined at the rate of ninety per cent.

### The Schedule of Insurance

The formula outlined above for calculating the Aggregate Attachment Point and determining the amount subject to reimbursement under the Aggregate Excess of Loss provision was discussed in the meetings between Aon Mass and PSO, and was generally understood by the parties. However, at some point some new concepts and terms were introduced into the mix.

The new terms are found in the Schedule of Insurance which was added to the policy and incorporated therein by the time PSO received a final copy of the policy on April 21, 2000. The new terms are found in the Insurance Binder, although with different numeric values than those found in the Schedule. The Insurance Binder was signed by PSO's Chief Operating Officer Beyer on April 6, 1999. The new terms are not found in any section of the Specimen Policy, including the

specimen schedule, the definitions, exclusions, etc., that PSO examined during the presentation of the proposal. A central question of fact posed by this dispute is when did PSO become aware of the new terms and concepts in the Schedule—which new terms, concepts and numeric limits serve to significantly change the coverage delineated in the body of the policy.

### The new terms

Item # 6 of the Schedule of Insurance, a provision entitled "Aggregate Excess of Loss Insurance," contains three new concepts that are not included or defined in the body of the policy, and which this Court determines to be ambiguous.

1) The first of these is the "Minimum Aggregate Attachment Point." After completing the calculations to determine the Aggregate Attachment Point as described above and explained in the policy, Combined contends that these figures now must be scrapped, and new figures substituted. The new figures are the Minimum Aggregate Attachment Points provided in the Schedule. The Minimum Aggregate Attachment Points are described by Combined as "underwriting safeguards." These figures, in both the case of commercial patients and Medicare/Medicaid patients, are much higher than those tallied in the initial calculations. The result is that when the new figures are subtracted from the eligible charges, little remains to be reimbursed by Combined at the rate of ninety per cent.

Combined contends that the Minimum Aggregate Attachment Points are to be substituted for the Aggregate Attachment Points derived from the calculations; however, this interpretation of the words used is not apparent without Combined's explanation. Neither the policy nor the Schedule provides an explanation of the meaning or impact of the term "Minimum

Aggregate Attachment Point." The meaning of the term is not apparent from the four corners of the agreement.

This Court concludes that the phrase "Minimum Aggregate Attachment Point" is not defined and is not self-explanatory as used in the insurance policy documents and, consequently, is ambiguous. Extrinsic evidence is necessary to determine whether or not this term was explained adequately and in a timely manner to PSO, and, if not, why not.

■ 2) Also new in Item # 6 of the Schedule is the phrase "Loss Limit Per Covered Person." "Loss Limit Per Covered Person" is explained in the schedule as follows:

Hospital: $35,000 in excess of the first $40,000 of the Covered Amount

Physician: $7,000 in excess of the first $10,000 of the Covered Amount

As Defendants have subsequently explained in their briefs and at oral argument, this provision is intended to limit the eligible charges that are aggregated. The correct total does not simply represent an aggregate of the Billed Charges for Eligible Services as previously defined and used in the Aggregate Excess of Loss Insurance provision of the policy; instead, it is only those charges, in the case of hospital services, over $40,000.00 but under $75,000.00 that accrue to the aggregate and, in the case of physician services, only those properly billed charges over $10,000.00 but under $17,000.00 that accrue to the aggregate.

PSO claims that it was unaware of this limitation on the accrual of Billed Charges for Eligible Services, and believed that all Billed Charges for Eligible Services would accrue to the aggregate. Confusion was rampant among both Defendants' employees when, at the conclusion of the policy term, medical charges were submitted to the broker and the insurance company for adjudication (a determination of which charges are "eligible"). The confusion is illustrated by the many e-mail messages exchanged by Aon Mass and Combined staff members debating the correct implementation of the Loss Limits.

While the Court is convinced that Combined intended the Loss Limits to work as explained above; the Court finds that the phrase is not clear on its face. No definition or explanation is provided in the body of the policy or in the Schedule. Again, the question is how clearly, if at all, was this limitation explained to the insured? And by whom? And when?

■ 3) The third unexplained term in the Schedule is found in Item # 6c, labeled "Maximum Limit of the Company's Aggregate Liability:"

Commercial: $1,000,000 in excess of the Aggregate Deductible

Medicare/Medicaid: $1,000,000 in excess of the Aggregate Deductible

The phrase "Aggregate Deductible" is not defined or explained in the policy or in the Schedule. The Court must underscore that neither side has raised an issue concerning the interpretation of the Aggregate Deductible; however, as PSO urges that it now must be paid the $1,000,000 maximum limit, the question may still arise. Without explanation or definition, this phrase is also ambiguous.

### The controversy arises

PSO alleges that it was unaware of the new terms in the Schedule and their potential impact until long after the termination of the policy period. PSO submitted its records to Aon Mass in due time, and was distressed when no payment was forthcoming from Combined within the forty-five day period specified in the policy. As more and more time elapsed, PSO's staff began to pressure Aon Mass to

find out from Combined why the claim had not been paid. Combined never communicated directly or via Aon Mass that the information provided by PSO was inaccurate or incomplete. Finally payment was made by Combined, but PSO determined that it was too little, too late, and this lawsuit was filed.

The payment made by Combined was in the amount of $420,427.48 for coverage under the Specific Excess of Loss provision of the policy, and $162,756.04 under the Medicare/Medicaid portion of the Aggregate Excess of Loss provision of the policy. No payment was made pursuant to the commercial portion of the Aggregate Excess of Loss provision of the policy because the aggregated charges in this category failed to exceed the new Minimum Aggregate Attachment Point of $1,000,000.00. This constitutes a partial denial of PSO's claim.

An additional fact of possible relevance is that Aon Mass and Combined are both owned by the same parent company, a fact that PSO claims to have learned only after the breakdown in the business relationship among the parties. Aon Mass maintains that this fact was disclosed to PSO prior to its selection of the Combined insurance policy.

### Interpretation of the policy language

Both PSO and Combined have requested that the Court construe the language of the policy. Both moving parties urge the Court to find that the language of the policy is clear and unambiguous, and in accord with their respective interpretations. PSO argues that the Schedule of Insurance is not rightfully part of the insurance policy and is not part of the contract between the parties. Consequently, PSO argues, the Court should interpret only the clear and unambiguous language found in the body of the policy. Combined argues that the Schedule of Insurance is incorporated into the policy proper, and that its language is clear and unambiguous and must be applied as it is written. The Court concurs with Combined's view that the Schedule of Insurance is incorporated into the policy and cannot be ignored; however, the Court finds that the language therein is unclear and ambiguous.

 The law is well settled that the court is to interpret the terms of an insurance policy according to the principles set forth for interpretation of contracts generally. *Casco Indemnity Company v. Rhode Island Interlocal Risk Management Trust,* 929 F.Supp. 65, 69 (D.R.I.1996). The court must examine the policy in its entirety in order to determine the intent of the parties and, whenever possible, to effectuate that intent. *Id.* at 69.

> The language used in the policy must be given its plain, ordinary, and usual meaning. When the terms are found to be clear and unambiguous, the task of judicial construction is at an end. The contract terms must then be applied as written and the parties bound by them.

*Id.,* quoting *Malo v. Aetna Casualty and Sur. Co.,* 459 A.2d 954, 956 (R.I.1983).

 However, where the language of the policy is subject to more than one interpretation, and there is a reasonable dispute about the coverage provided, the court may consider extrinsic evidence concerning the surrounding circumstances as they may shed light on the parties' intent. *Eagle–Picher Industries, Inc. v. Liberty Mutual Ins. Co.,* 682 F.2d 12, 17 (1st Cir. 1982). "For example, evidence of the construction given to the language by the parties and of the customary usage of persons in the same commercial setting is normally admissible." 682 F.2d at 17. The *Eagle–Picher* Court goes on to suggest that a district judge, sitting without a jury, might admit all admissible extrinsic

evidence of the parties' intent "to guard against reversal." 682 F.2d at 18. See also *Mendez v. Brites*, 849 A.2d 329, 338 (R.I.2004). In *Commercial Union Ins. Co. v. Seven Provinces Ins. Co., Ltd.*, the First Circuit deemed proper the trial court's admission of expert testimony on trade usage and industry practice to aid in the interpretation of the language of an insurance policy. 217 F.3d 33, 38 (1st Cir.2000).

In the present dispute, the issue that must be resolved by a fact-finder is not what the insurance company intended by the new provisions in the Schedule of Insurance, but what the parties understood at the onset of the contract. Was there a shared intent, and, if so, what was it?

■■ In the case of ambiguous policy language, it is black letter law that insurance policies are interpreted against the drafter (*contra proferentum*) and in favor of the insured, in order to achieve the public policy goal of providing insurance coverage for consumers. *Mallane v. Holyoke Mut. Ins. Co.*, 658 A.2d 18, 20 (R.I. 1995). Courts seek to determine not what the insurer intended by its policy language, but what an ordinary reader and typical insurance consumer would understand the language to mean. *Zarrella v. Minnesota Mut. Life Ins. Co.*, 824 A.2d 1249, 1259 (R.I.2003). This ordinary and typical insurance purchaser is one "untrained in either the law or insurance field." *New Life Brokerage Services v. Cal–Surance Assoc.*, 334 F.3d 112, 113 (1st Cir.2003).

Pointing out that PSO's Chief Operating Officer Beyer had over 20 years in the health industry risk management field, Defendants take issue with the depiction of PSO as an ordinary purchaser of insurance. To support their position, Defendants point out that courts have identified a "sophisticated parties" exception to the "ordinary purchaser" rule, where two parties to an insurance contract are "equally sophisticated," or where the "insured negotiated for contract terms tailored to govern the outcome of the lawsuit." *Commercial Union Ins. v. Walbrook Ins. Co.*, 7 F.3d 1047, 1053 n. 8 (1st Cir.1993).

While noting the exception to *contra proferentum*, the *Commercial Union* Court points out that it is invoked sparingly, and declines to employ it in any case, where it finds the insurance policy before it to be unambiguous. *Id.* at n. 8.

The Rhode Island Supreme Court also recognized the "sophisticated consumer" exception but refused to use it in *Textron, Inc. v. Aetna Cas. and Sur. Co.*, 754 A.2d 742, 749 (R.I.2000). Pointing out that other jurisdictions have upheld the *contra proferentum* doctrine not just in the case of unsophisticated consumers, but also in the case of corporations despite their increased "business acumen and bargaining power," the Rhode Island Supreme Court explained:

> To apply this principle to large corporations such as Textron makes more sense in the insurance-policy context than it might in other settings: while business customers of insurance companies may at first glance appear to have more power in negotiating an insurance contract, in fact the only negotiation that typically occurs over the policy language is that between state regulators and the insurers. (cites omitted) Often the commercial insured such as Textron does not even view the policy's language until after it pays the premiums.

*Id.* at 749–750, n. 2.

■ While PSO may not have bargained for the contractual terms in the policy, Aon Mass is prepared to present evidence that the disputed terms in the Schedule were explained to PSO personnel extensively prior to the signing of the Insurance Bind-

er. Further, Aon Mass will argue that PSO's staff understood, or should have understood, or was provided with ample opportunity to understand, the terms in question. This extrinsic evidence will be relevant to a determination of whether or not the ambiguous terms in the Schedule of Insurance should be construed in favor of PSO.

## The Counts in the Complaint

### Standard of Review

When ruling on a motion for summary judgment or partial summary judgment, the court must look to the record and view all the facts and inferences therefrom in the light most favorable to the nonmoving party. *Continental Cas. Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1st Cir.1991). Once this is done, Rule 56(c) requires that summary judgment be granted if there is no issue as to any material fact and the moving party is entitled to judgment as a matter of law. A material fact is one affecting the lawsuit's outcome. *URI Cogeneration Partners, L.P. v. Board of Governors for Higher Education*, 915 F.Supp. 1267, 1279 (D.R.I.1996). Factual disputes are genuine when, based on the evidence presented, a reasonable trier of fact could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

To win summary judgment on a particular count of the complaint, the moving party must show that "there is an absence of evidence to support" the nonmoving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In response, the nonmoving party cannot rest on its pleadings, but must "set forth specific facts demonstrating that there is a genuine issue for trial" as to the claim that is the subject of the summary judgment motion. *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988).

### Count I

In Count I, PSO alleges breach of contract against Combined. Both PSO and Combined have moved for summary judgment on this Count.

PSO charges that Combined breached the contract—the insurance policy—by making its payment almost a year after it was due; by making a payment that was not the full amount due under the contract; and by including new terms in the Schedule of Insurance that were not discussed previously, and, consequently, were not part of the bargain.

Combined does not dispute that the payment was late. This problem ultimately can be cured, Combined points out, through the addition of interest at the time that the underlying dispute is resolved. As for the other allegations, Combined responds that the terms of the contract were accepted by PSO when it signed the Insurance Binder.

As with other contracts, the formation of a contract of insurance requires "a manifestation of mutual assent in the form of an offer or proposal by one party and an acceptance thereof by the other." *John Hancock Mutual Life Ins. Co. v. Dietlin*, 97 R.I. 515, 518, 199 A.2d 311, 313 (1964). "Ordinarily, the application for a policy is the offer, and before a contractual relationship can come into being the offer must be unconditionally accepted." *Id.* at 518, 199 A.2d at 313. See also *Goucher v. John Hancock Mutual Life Ins. Co.*, 113 R.I. 672, 676, 324 A.2d 657, 660 (1974).

In this case, the proposal from Combined served as the offer. The unconditional acceptance occurred when Beyer of PSO signed the Insurance Binder. Were the offer and acceptance a result of a

meeting of the minds enjoyed by the parties at any point in the transaction? Was it a breach of contract for Combined to insert new concepts in the Insurance Binder that were not included in the Specimen Policy and that had not been discussed during a year of meetings between PSO and Aon Mass? Was it a breach of contract for Combined to use new numeric values in the Schedule of Insurance that were not those specified in the Binder? These are questions of fact that must be resolved by the finder of fact. Consequently, as these questions go to the heart of the dispute over the interpretation of the contract language, summary judgment is not appropriate at this stage of the proceedings. Therefore the motions of both PSO and Combined are denied on Count I of the Amended Verified Complaint.

### Count II

In Count II, PSO charges that Aon Mass breached the insurance contract, or, in the alternative, breached its agreement to serve as PSO's insurance broker. Aon Mass responds to the former charge by pointing out that it was not a party to the insurance contract and so cannot be in breach.

As for the allegation that Aon Mass breached its agreement to serve as PSO's broker, Aon Mass maintains that, to whatever extent its conduct was governed by an agreement with PSO, it fulfilled its part of the bargain when it procured "stop loss" insurance coverage for PSO.

PSO alleges that Aon Mass may not have forwarded its billed charges to Combined for adjudication in a timely manner; that Aon Mass may have refrained from urging Combined to complete its adjudication in a timely manner; and that Aon Mass may not have double checked Combined's adjudication, but merely forwarded Combined's final package to PSO. However-

er, PSO presents no evidence to support these allegations. More importantly, PSO presents no evidence of a verbal or written agreement between PSO and Aon Mass. It is undisputed that Aon Mass did procure "stop loss" insurance coverage for PSO. It is also undisputed that the coverage offered by Combined was the only coverage available that included any kind of an aggregate excess of loss provision. While PSO may have misunderstood the nature of the coverage, or may even have been misled as to the nature of the coverage, there is no evidence that this misunderstanding represents any kind of breach of contract by Aon Mass.

In order to avoid summary judgment, a party "may not rest upon mere allegations or denials in its pleadings and has an affirmative duty to set forth specific facts showing a genuine issue of fact to be resolved at trial." *Russian v. Life–Cap Tire Services,* 608 A.2d 1145, 1147 (R.I.1992). The United States Supreme Court has observed that Rule 56(c) mandates an entry of summary judgment against a party who fails to make a sufficient showing to establish an element essential to that party's case, and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548.

In this case, PSO has not presented sufficient evidence of a contract with Aon Mass, or sufficient evidence of a breach, to survive Aon Mass' summary judgment challenge. The Court grants summary judgment in favor of Defendant Aon Mass on Count II of the Amended Verified Complaint, and, for obvious reasons, denies PSO's motion for summary judgment on that count.

### Count III

Count III charges a breach of the implied duty of good faith and fair dealing by

Combined. Combined seeks summary judgment on this Count.

 Under Rhode Island law, there is an "implied covenant of good faith and fair dealing between parties to a contract so that contractual objectives may be achieved." *Ide Farm & Stable, Inc. v. Cardi*, 110 R.I. 735, 739, 297 A.2d 643, 645 (1972). This Court has written previously that, "The applicable standard in determining whether one has breached the implied covenant of good faith and fair dealing is whether or not the actions in question are free from arbitrary or unreasonable conduct." *Ross–Simons of Warwick, Inc., v. Baccarat, Inc.*, 66 F.Supp.2d 317, 329 (D.R.I.1999). The implication of the duty is that the parties will act in a manner consistent with the purposes of the contract. *Hord Corp. v. Polymer Research Corp. of America*, 275 F.Supp.2d 229, 237 (D.R.I.2003). If the particular actions were contemplated by the parties when the contract was formed, there is no breach of the covenant of good faith and fair dealing. Consequently, "a party's actions must be viewed against the backdrop of contractual objectives in order to determine whether those actions were done in good faith." *Id.* at 238.

 Unfortunately, the contractual objectives of PSO and Combined are at the center of the dispute between these parties. Both sides argue that the policy's objectives were clear, and that the other side altered those objectives unilaterally in order to achieve individual goals. Their arguments present genuine and central issues of material fact preventing the imposition of summary judgment. Consequently, Combined's Motion for Summary Judgment on Count III of the Amended Verified Complaint is denied.

## Count IV

 PSO also alleges a breach of the covenant of good faith and fair dealing against Aon Mass. Aon Mass seeks summary judgment on this Count.

As previously stated, the Rhode Island Supreme Court has found that every contract has an implied term of good faith and fair dealing consistent with the achievement of the contractual objectives. *Ide Farm & Stable*, 297 A.2d at 645. However, the implied contractual term is only found in the context of a binding contract between the parties. *Centerville Builders, Inc. v. Wynne*, 683 A.2d 1340, 1342 (R.I. 1996). As the Court has indicated above, PSO has presented no evidence of a verbal or written contract between PSO and Aon Mass, and no evidence of a breach. Aon Mass undoubtedly agreed to assist PSO in the procurement of appropriate reinsurance. Aon Mass fulfilled these broker responsibilities when it procured a "stop loss" policy for PSO. Aon Mass' conduct in providing PSO with several proposals from different insurance companies was consistent with the parties' goal to achieve reinsurance coverage for PSO's risk contract with Bluechip.

PSO has failed to present any evidence of a breach of contract, or breach of an implied contractual term, on the part of Aon Mass. Consequently, Aon Mass' motion for summary judgment on Count IV of the Amended Verified Complaint is granted.

## Count V

 In Count V, PSO charges that it relied on Combined's negligent misrepresentations concerning the coverage provided by the policy and that Combined knew or should have known that it did not intend to fulfill the terms of those representations.

Combined responds that, as it had no direct contact with PSO, it made no representations to PSO, let alone negligent ones. Combined responds further that, to the extent that PSO relied on the terms in the Specimen Policy, its reliance was not justifiable. After PSO's Chief Operating Officer Beyer signed the Insurance Binder, Combined continues, PSO can no longer claim reliance on the Specimen Policy.

To make out a prima facie case for the tort of negligent misrepresentation, the plaintiff must establish the following elements: 1) a misrepresentation of a material fact; 2) the party making the representation must do so without knowledge as to its truth or falsity, or must do so under circumstances in which he or she should have known of its falsity; 3) the party making the representation must intend to induce another to act upon it; and 4) an injury must result to the party acting in justifiable reliance on the misrepresentation. *Mallette v. Children's Friend and Service*, 661 A.2d 67, 69 (R.I.1995).

■ In addition, as with all torts, the defendant must owe the plaintiff a duty of care and must breach that duty of care. *Id.* at 70. The Rhode Island Supreme Court has identified the duty owed by an insurance company to an insured as a "fiduciary obligation to act in the best interests of its insured and not its own pecuniary interest at all times." *Skaling v. Aetna Ins. Co.*, 799 A.2d 997, 1012 (R.I. 2002).

■ As this Court has written previously, the Rhode Island Supreme Court has also made it clear that contractual privity is not an element of the cause of action for misrepresentation. *Forcier v. Cardello*, 173 B.R. 973, 978 (D.R.I.1994), citing *Dowling v. Narragansett Capital Corp.*, 735 F.Supp. 1105. "Any third party," this Court wrote in *Forcier,* "who is intended as a recipient of the information and who foreseeably relies on such information is entitled to recovery if he or she does indeed rely." 173 B.R. at 987.

Based on the *Forcier* analysis, Combined's argument that it made no representations to PSO because it had no direct contact with PSO fails. As PSO states, Combined's initial proposal to it was a representation, as was the Specimen Policy.

■ However, the shortcoming in PSO's claim of negligent misrepresentation is its inability to demonstrate an injury resulting from its reliance on Combined's representations. Damages for a claim of negligent misrepresentation are limited to pecuniary losses suffered. *Gale v. Value Line, Inc.*, 640 F.Supp. 967, 972 (D.R.I. 1986). In *Gale,* plaintiff claimed that he had missed out on anticipated profits because of defendant's failure to include a key fact in an article concerning an investment. In addressing his negligent misrepresentation claim, the Court wrote:

> Plaintiff relies heavily upon Restatement of Torts 2d § 552. However, when it comes to the matter of damages, plaintiff shifts to a theory similar to a contract theory of damages. Plaintiff seeks to obtain the profits which would have accrued to him had the transaction gone according to his plan.... However, under Restatement of Torts 2d § 552B(b) this theory of damages is expressly rejected.

*Gale* at 972.

In the present case, PSO is also advancing a "contract theory of damages." Aon Mass did procure a "stop loss" policy for PSO and Combined did provide coverage pursuant to the policy. There is a question as to whether or not Combined has remitted the proper amount under the policy. However, PSO cannot say "but for" the misunderstanding about the coverage,

it would have procured a better insurance policy that would have provided greater compensation. Those kinds of damages are speculative, and PSO offers no evidence to establish that it considered or reviewed any other reinsurance policy that would have reimbursed its losses at a higher rate. In fact, Aon Mass and Combined have stated, and it is not disputed by PSO, that the Combined policy was the only policy that offered aggregate excess of loss coverage.

Assuming *arguendo*, that Combined did negligently misrepresent the terms of its insurance coverage to PSO, PSO cannot establish that it suffered a compensable loss as a result. Consequently, Combined's motion for summary judgment on Count V of the Amended Verified Complaint is granted.

## Count VII

Count VII alleges negligence against Aon Mass, for failing in its duty to procure adequate "stop loss" insurance coverage for PSO. Specifically, PSO charges that Aon Mass claimed it would procure the best "stop loss" policy possible for PSO; that it would represent PSO in a manner consistent with PSO's best interests; and that it would communicate all relevant options for "stop loss" coverage to PSO.

In response, Aon Mass claims that PSO cannot maintain a negligence claim on an issue of this complexity without expert testimony; and that, at any rate, Aon Mass did procure the proper coverage for PSO and extensively explained all aspects of the coverage to them. Moreover, Aon Mass charges that PSO is a sophisticated multi-million dollar entity affiliated with one of the largest health care systems in New England. It is indefensible and incredible that PSO could have entered into the insurance contract without a full understanding of its terms. Finally, Aon Mass points out that PSO has provided no evidence that there was any better insurance coverage available on the market, and so there were no adverse consequences to PSO as a result of its failure to fully understand the coverage provided by the policy.

It is this final argument that the Court finds most compelling. To best illustrate this point, the readers' attention must be directed across the country to Colorado, where the owner of a restaurant and bar, when faced with a lawsuit from a disgruntled patron, was dismayed to discover that his insurance policy lacked liquor liability coverage. *Bayly, Martin & Fay v. Pete's Satire*, 739 P.2d 239 (Colo.1987). Referencing *Prosser and Keeton on Torts* § 30, at 164–165 (5th ed.1984), the *Bayly, Martin* Court wrote:

> Basic principles of tort law provide the framework for determining the burden of proof in a negligence action predicated on the failure of an insurance broker or agent servicing the insurance needs of the plaintiff to procure a particular type of insurance coverage sought by the plaintiff. A cause of action founded on negligence requires proof of the following elements: (1) a duty or obligation, recognized by law, requiring the defendant to conform to a certain standard of conduct for the protection of others against unreasonable risks; (2) a failure or breach of duty by the defendant to conform to the standard required by law; (3) a sufficient causal connection between the offensive conduct and the resulting injury; and (4) actual loss or damage resulting to the interests of the plaintiff.

*Bayly, Martin* at 242.

The Court continues that it is indisputable that the broker or agent who agrees to obtain a certain type of coverage must either obtain it or notify his or her

client of the failure to do so. *Bayly, Martin* at 243. Notwithstanding a breach of this duty, the successful negligence action also requires a demonstration of causation and damages:

It would be insufficient under these circumstances merely to allege loss of opportunity to seek insurance coverage where the attempt might not have been successful; rather, the ultimate purpose to be effected is to allow recovery where, had the defendant acted properly, plaintiff would not only have the opportunity to seek, but also could have successfully procured alternative insurance. . . . The law is well established that the plaintiff must show by the preponderance of the evidence that other insurance could have been obtained, which requirement arises out of the plaintiff's obligation to prove causation and damages.

*Bayly, Martin* at 243. The Court explains further that the plaintiff must prove by a preponderance of the evidence that the desired insurance coverage was generally available in the insurance industry when the broker procured the inadequate coverage for the plaintiff. *Id.* at 244.

In the present case, PSO has made no showing that there was any better insurance coverage to be had. Unlike the poor bar owner in the *Pete's Satire* case who discovered he had *no* insurance coverage, Plaintiff here had "stop loss" reinsurance coverage procured by its broker. With hindsight, PSO is not sure whether it was the *best* coverage that might have been available. However, both Defendants assert that the policy in question was the only policy available that offered aggregate excess of loss coverage. PSO does not dispute this assertion. PSO has not fulfilled its burden to demonstrate that there was better insurance coverage available on the market, and that it was dam-

aged by Aon Mass' failure to procure a better policy. Consequently, PSO's negligence claim fails and Aon Mass' motion for summary judgment on Count VII of the Amended Verified Complaint is granted.

## Count VIII

In Count VIII of the complaint, PSO charges that Aon Mass breached its fiduciary duty to act in good faith in procuring "stop loss" insurance for PSO. Specifically, PSO claims that Aon Mass breached its duty when it failed to disclose its corporate affiliation with Combined when it recommended Combined's insurance policy to PSO. Aon Mass denies that it failed to disclose its corporate affiliation with Combined in a timely manner. It also asserts that its relationship with PSO was an arm's length commercial/contractual relationship, not a fiduciary relationship. Moreover, Aon Mass states, it fulfilled whatever duty it had to PSO when it procured the "stop loss" policy.

This Court has written previously that, "A fiduciary relationship arises when the facts show a special relationship of trust and confidence that requires the fiduciary to act in the other party's best interests." *Fraioli v. Lemcke*, 328 F.Supp.2d 250, 267 (D.R.I.2004). The case law indicates, and Aon Mass has cited such a case, *Stockett v. Penn Mut. Life Ins. Co.*, 82 R.I. 172, 177, 106 A.2d 741 (1954), that the commercial relationship between an insurance company and the insured is not ordinarily a fiduciary one. See *VanWest v. Midland*, 2000 WL 34019293 (D.R.I.). However, the relationship between an agent and its principal is distinctly different. See *Affleck v. Kean*, 50 R.I. 405, 148 A. 324, 325 (1929); *Matarese v. Calise*, 111 R.I. 551, 305 A.2d 112, 119 (1973); *Cahill v. Antonelli*, 120 R.I. 879, 390 A.2d 936, 939 (1978).

In a New Jersey case that is on point, *Tomaszewski v. McKeon Ford, Inc.*, 240 N.J.Super. 404, 573 A.2d 501, (1990), a salesman at a car dealership sold Mrs.

Tomaszewski a car, along with a credit life and disability insurance policy to cover the financing of the car. Although Mrs. Tomaszewski wanted to buy the car in her own name, she did not have sufficient credit and the dealership insisted that her husband be joined as a co-buyer. However, the dealership failed to include Mr. Tomaszewski as an insured on the insurance policy. When her husband died soon thereafter, Mrs. Tomaszewski was unable to make the car payments and her car was repossessed. While recognizing that Mrs. Tomaszewski had not fully read the insurance policy, the Court pointed out that the car salesman was the only one in the position of advising her of the importance of including her husband on the policy. The Court explained:

> One who holds himself out to the public as an insurance broker is required to have the degree of skill and knowledge requisite to the calling. When engaged by a member of the public to obtain insurance, the law holds him to the exercise of good faith and reasonable skill, care and diligence in the execution of the commission. He is expected to possess reasonable knowledge of the types of policies, their different terms, and the coverage available in the area in which his principal seeks to be protected. If he neglects to procure the insurance or if the policy is void or materially deficient or does not provide the coverage he undertook to supply, because of his failure to exercise the requisite skill or diligence, he becomes liable to his principal for the loss sustained thereby.

*Tomaszewski* at 503.

In the present case, the undisputed facts indicate that PSO trusted and relied on Aon Mass to guide it through the thicket of reinsurance choices. Though some members of PSO were sophisticated businessmen, it is also clear that the particular "stop loss" coverage in question was not only something new in the industry but also formidable in its complexity. PSO turned to Aon Mass, rather than the local office of Aon, because of its expertise in this field. Despite Aon Mass' assertions to the contrary, it is definitely possible, when all the facts are developed, that the Court could find that a fiduciary relationship existed between the parties.[1]

Once a fiduciary relationship is established, the same questions arise that are pertinent to the analysis of the prior counts. Was Aon Mass aware of the new terms in the Schedule of Insurance and the impact that those terms would have on PSO's recovery under the policy? Was Aon Mass aware that PSO did not understand those terms? What were Aon Mass' motivations in recommending the Combined coverage to PSO? These are all questions to be addressed at trial. Consequently, Aon Mass' motion for summary judgment on Count VIII of the Amended Verified Complaint is denied.

### Conclusion

For the reasons stated above, the Court denies the motions for summary judgment of both Combined and PSO as to Count I; grants Aon Mass' motion for summary judgment on Count II and denies PSO's motion on that Count; denies Combined's motion for summary judgment on Count III; grants Aon Mass' motion for summary judgment on Count IV; grants Com-

---

1. Breach of fiduciary duty is an equitable claim and, as such, is not subject to jury determination. See *Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co.*, 51 F.Supp.2d 81, 90–91 (D.R.I.1999), *aff'd.* 215 F.3d 182, 186 (1st Cir.2000). The Court intends that evidence on this claim will be presented at trial; but findings of fiduciary duty and breach, if any, will be made by the Court.

bined's motion for summary judgment on Count V; grants Aon Mass' motion for summary judgment on Count VII; and denies Aon Mass' motion for summary judgment on Count VIII. Combined's motion to have the matter turned over to an independent auditor is denied as premature. To recap, what is left for trial is as follows: Count I, a breach of contract claim by PSO against Combined; Count III, a breach of the implied duty of good faith and fair dealing claim by PSO against Combined; Count VI, a fraudulent misrepresentation claim by PSO against Combined (no motion was made as to this Count); and Count VIII, a breach of fiduciary duty claim by PSO against Aon Mass.

No judgment shall enter until all claims in this case are resolved.

It is so ordered.