DECISION
Before this Court is an inter-family dispute over ownership of numerous properties and businesses located in Rhode Island. Following a non-jury trial, this Court requested the parties to submit post trial briefs. Having reviewed said briefs, this Court now will render a Decision. Jurisdiction is pursuant to G.L. 1956 §§ 8-2-13 and 8-2-14.
 I Facts and Travel
On December 22, 2004, plaintiff Domenic D'Agostino (Domenic) (a.k.a. Thomas) filed a Complaint against his sister-in-law, Nancy D'Agostino (Nancy), and her children, Henry D'Agostino, Jr. (Henry Jr.), Linda D'Agostino (Linda), and Janet D'Agostino (Janet). Nancy was married to Domenic's brother, Henry D'Agostino (a.k.a. Harry) (Henry Sr.), when he died in 1984. Henry Sr. was the father of Henry Jr., Linda, and Janet.
In his Complaint, Domenic asserted that he purchased unimproved real estate located on Ridge Road (Ridge Road property) in 1957.See Complaint at 1. He contended that Henry Sr. agreed to hold the record title to the property in his name, because Domenic faced potential liability for negligence at his demolition and wrecking business. Domenic further contended that he would be the actual owner, and that he retained all equitable and legal title in the Ridge Road property. See id. at 2. Domenic's Complaint contained four counts: Constructive Trust (Count I), Resulting Trust (Count II), Bare Legal Title (Count III), and Adverse Possession (Count IV). See id. at 3-4.
In response to the Complaint, Nancy, Henry Jr., Linda, and Janet (the defendants or counterclaimants) filed an answer, as well as a two-count Counterclaim on February 18, 2005. Count I of the Counterclaim, entitled Fraud and Misrepresentation, alleged that by his fraudulent conduct, Dominic is attempting to deprive them of their ownership interest in the Ridge Road property. See Answer and Counterclaim at 3-4. In Count II, they seek this Court to certify title to the Ridge Road property.See id. at 4.
Thereafter, on February 23, 2005, the defendants filed a Third-Party Complaint against National Wrecking Co., Inc. (National Wrecking) and John Doe Corporations A through E. See Third Party Complaint. Domenic is the president of National Wrecking. See id at 1. They asserted that at the time of his death, Henry Sr. owned 25% of National Wrecking, and they seek profits and equitable distribution from that business.See ?? at 1. They also filed a claim of conversion against National Wrecking and/or John Doe Corporations A through E. See id. They further sought reasonable attorney's fees and punitive damages.
On September 16, 2005, the counterclaimants amended their Third-Party Complaint and Counterclaim. In doing so, they added Providence Crane Service Company, Inc. (Providence Crane), Industrial Wrecking Company, Inc. (Industrial Wrecking), Allen Lumber Company (Allen Lumber), and Allen Realty Company, Inc. (Allen Realty), as third-party defendants.See Amended Third-Party Complaint and Counterclaim at 1. In addition, their cousins — Peter R. D'Agostino (Peter), Louis D'Agostino (Louis) and Alan D'Agostino (Alan) — joined the lawsuit as counterclaimants.See id. Peter, Louis, and Alan are the children of Dominic's deceased brother, Luigi D'Agostino (a.k.a. Cheech or Chief). See id.
In their Amended Third-Party Complaint, the counterclaimants asserted that Dominic and three of his brothers, Henry Sr., Luigi, and Vincent (a.k.a. Jimmy) (collectively, the D'Agostino brothers) formed and operated various businesses including, but not limited to, National Wrecking, Providence Crane, Industrial Wrecking, Allen Lumber, and Allen Realty. See id. at 1-2.[1] They contended that the businesses tortiously converted various business assets and profits for Domenic's use, and failed to account for the profits derived from those businesses. See id. at 2. They seek equitable distribution and an accounting, as well as attorney's fees and punitive damages.See id.
On February 17, 2006, Domenic amended his Complaint to add seven additional counts. See Amended Complaint at 4-9. In Count V, he added a claim of unjust enrichment and contribution with respect to the Ridge Road property. Counts VI through XI relate to property located on Grotto Avenue in Pawtucket (the Grotto Avenue property). Essentially, he asserted that he purchased the Grotto Avenue property with his own funds, and that due to a clerical error, the property was conveyed to himself, Vincent, Henry Sr., and Luigi as tenants in common rather than as joint tenants. See id. at 4-5. With respect to the Grotto Avenue property, Domenic seeks a declaration of joint tenancy (Count VI); a constructive trust (Count VII); a resulting trust (Count VIII); bare legal title (Count IX); adverse possession (Count X); and unjust enrichment/contribution (Count XI).
After discovery, the matter came before this Court for a non-jury trial. The parties gave differing versions of the events surrounding the establishment and operation of various businesses, and the purchase of certain properties. What appears to be undisputed is the following: in 1928, Vincent and Luigi created a business to empty furnaces and haul coal ash. They later established excavation and demolition businesses. At some point, they also launched the Allen Lumber Company on Branch Avenue in Providence. In 1938, the D'Agostino brothers reportedly purchased one of the first cranes in Rhode Island. They ceased operations during the course of World War II. After the War, the businesses reopened.
Domenic's Testimony
Domenic testified that he was unemployed for a few years after World War II, and that he later worked with Vincent at the lumber yard. He said he had no ownership interest either in the lumber yard or the unincorporated crane business, and he denied the existence of any partnership agreement among the D'Agostino brothers. In 1951, a fatal crane accident occurred at Providence Crane and the business faced a potential wrongful death lawsuit. According to Domenic, the reason he placed the Ridge Road property in Henry Sr.'s name was to avoid any potential liability associated with the lumber yard or crane business. Domenic stated that he never shared any confidences with Henry Sr.
Domenic further testified that he prudently saved his veteran's benefits, earnings from his employment at the lumber yard, $15,000-$ 16,000 in cash wedding gifts, and income from the condemnation of property that he previously owned on Cemetery Street in Providence. He then stated that he used these savings to purchase numerous properties for his sole benefit, including the properties at issue in this case. He said that he provided his personal funds for all of the properties purchased by Allen Realty, but that he held them in the names of the D'Agostino brothers as joint tenants. Domenic claimed that Henry Sr. never owned any property and that he purchased a lot in Providence and built a house for Henry Sr., and his family. He denied that Henry Sr. ever transferred property to him, and declared that a 1958 quitclaim deed from Henry Sr. to Domenic was a "phony." See Defendants' ExhibitA. Domenic stated that he built houses "entirely by myself," including Henry Sr.'s house, and that none of his brothers or nephews ever were involved in housing construction.
According to Domenic, he incorporated several businesses between the late 1950s and early 1960s, including National Wrecking, Industrial Wrecking and Providence Crane. He denied that his brothers had any ownership interest in the corporations or in Allen Realty. Each of the aforementioned corporations issued stock/share certificates, and they were distributed as follows: 100%) of National Wrecking to Luigi; 100% of Providence Crane to Domenic; 51% of Industrial Wrecking to Domenic; 24.4% of Industrial Wrecking to Henry Sr.; and 24.4% of Industrial Wrecking to Luigi.
Domenic stated that he alone managed all of the businesses, and that his brothers and nephews merely were his employees. However, Plaintiffs Exhibit # 25 contradicts this claim. It lists the officers and directors of the various businesses as follows: (1) National Wrecking (in 1957) — Luigi was President, Vice President, and Treasurer; Thomas (a.k.a. Domenic) was Secretary; and the Directors were Luigi, Vincent, Thomas and Henry;[2] (2) Providence Crane (in 1959) — Thomas (a.k.a. Domenic) was President, Treasurer and Secretary; Henry was Vice President; and all four brothers were directors; (3) Industrial Wrecking (in 1955) — Louis was President, Henry was Vice President, and Thomas (a.k.a. Domenic) was Treasurer; (4) Allen Lumber (in 1959) — Louis was President, Thomas (a.k.a. Domenic) was Treasurer and Henry was Secretary. Plaintiff s Exhibit #25.
Meanwhile, Domenic's nephews — Henry Jr., Louis and Alan — joined the businesses in the early to mid 1970s, and worked there until they walked out in 2005. Domenic testified that his nephews never had any ownership interests or managerial positions in the businesses and that, like his brothers, his nephews simply were employees. He further stated that he never told his nephews that they had any ownership interest in the business, and that they never expressed such a belief.
However, Plaintiffs Exhibit # 25 indicates that in 1985, Louis and Alan were listed as directors in Providence Crane. Domenic maintained that all of the businesses were unprofitable, but that he continued to invest his own money into them so that he could provide employment for his brothers and nephews. He claimed that his personal contributions amounted to $250,000.
In 1955, Domenic and Henry Sr. granted power of attorney to each other over their respective affairs. Domenic stated that he purchased the Ridge Road property with his personal funds, but that he placed the title in his brother's name to shield himself from potential liability for business-related negligence. National Wrecking did business from the Ridge Road property. Domenic noted that although Henry Sr. did not want his name on the Ridge Road property, he reluctantly agreed to the arrangement to accommodate Domenic's concerns. Domenic also testified that he maintained full and complete possession of the Ridge Road property at all times, and that he had paid all of the taxes and assessments on the property.
Domenic further testified that he approached Nancy shortly after the death of Henry Sr. in 1984, and that he told her that he was the sole owner of the Ridge Road property and demanded that she hand over the title. Nancy refused. Domenic said that in 2004, he offered Nancy a $5,000 gift in return for transfer of the title. Again, she refused. Domenic also maintained that after his brothers died, he continued to pay their net pay to their surviving spouses; namely, $145 per week.
The Counterclaimants' Testimony
According to the counterclaimants, the D'Agostino brothers worked continuously and tirelessly together for the businesses from shortly after World War II until the deaths of Vincent, Luigi, and Henry Sr. They testified that the brothers were equal partners in the businesses, and that each had equal control and ownership of the assets, regardless of how they were assigned on paper. They further said that by common consent and acknowledgement, and irrespective of how ownership of the properties and businesses was designated, the D'Agostino brothers recognized that all of the assets were family property held for their benefit, and for the benefit of their respective families.
Nancy's Testimony
Nancy, testified that although she handled the household accounts with money that her husband gave to her, she knew nothing about Henry Sr.'s financial affairs. She stated that her husband never wanted to be involved in any paperwork or office work of any kind. She said that Henry Sr. drove trucks, performed welding work, and operated heavy trucks at the various businesses. She further testified that the businesses overlapped and essentially were "all the same thing," and that "we always assumed it was everybody's."
Nancy stated that Henry Sr. and Domenic were very close, and were like "two peas in a pod." She further testified that all of the brothers contributed to the businesses. She said that she was not very familiar with the Ridge Road property, and that Henry Sr. had no reason to use it. She said that she had "assumed" that the family business purchased the property, and her understanding was that all the businesses and properties belonged to each of the families in equal shares. She also testified that she believed that Domenic's weekly payments to her after her husband's death constituted a reflection of Henry Sr.'s interest in the businesses.
Louis D'Agostino's Testimony
Louis, who was around sixty years of age, testified that in 1958, when he was twelve years old, he began to work for the family business during his summer vacations. He testified that during that time, he helped in the construction of one of the last of approximately twenty-five houses that his father and uncles built. He stated that after he graduated from college, he obtained a master's degree. Thereafter, in 1972, he went to work for National Wrecking, where he earned $145 dollars per week, in addition to a tank of gasoline. He testified that "we worked as if we were owners." He stated that neither he, nor his uncles and cousins, would have worked for seven days a week at such low earnings if they were not owners.
Louis further testified that his father and uncles worked very well together and trusted one another. He said that his father approved of Domenic running the administrative end of the business, and that over the years, they all worked together and pooled their earnings. Louis stated that his father and uncles knew what was expected of each of them and that and that none of them acted as if he were the "boss." Louis testified that his father repeatedly referred to himself and his brothers as owners, and he showed Louis a deed on which indicated his father's ownership interest in the property.
Louis stated that he and his father loved working for the business, which they "lived and breathed." He stated that in the 1970s, business was very brisk and that they never stopped working, often juggling ten jobs at a time. However, according to Louis, "we" had problems with Domenic's son, Tom. He testified that Domenic would assure them that "we're all in this together," and "we've got to get along because it's our business." Louis also said that he recalled a conversation between his father and his uncles in which they discussed the possible sale of the Ridge Road property, and how the proceeds would be divided equally among the families.
Alan's Testimony
Fifty-six year-old Alan, testified that in the 1960s, he used to help move salvage materials during the weekends, and perform carpentry work on second-hand lumber so that it could be recycled in housing construction. He stated that after he graduated from Providence College with a degree in business administration, he worked for a company called Diamond Lumber for approximately one and one-half to two years. Around 1972 or 1973, he left Diamond Lumber to work at the Grotto Avenue location. The employment resulted in Alan having to take a pay cut, and having to work harder and longer hours. Alan said that he did not mind the changes because he liked the work, and he felt more comfortable working in the family business.
Alan testified that at first, he worked as a laborer in the yard, but that he later followed in his father Luigi's footsteps and obtained a license to operate a crane. In addition, he operated a bulldozer after Henry Sr. fell ill. He said that they "were always busy," and that they demolished one to two houses per week. He also said that although Domenic appeared to run the business, everyone was involved in the decision-making processes. Alan further stated that his father told him "I am an owner of the business," and that one day all their hard work would pay off because, eventually, it would become a "very comfortable" business. After Luigi died, Alan said that the business continued to run smoothly because with all of their experience, every one of them knew what needed to be done without direction.
Alan then discussed his relationship with Domenic, and Domenic's son, Tom. He said that Tom did not want to work and that caused family arguments. Alan testified that Domenic tried to resolve such confrontations by telling everyone "we should work together, we're all owners." Alan further testified that Domenic never alleged that he was the sole owner of any property.
Alan said that the atmosphere at the business began to sour over the past two years because Domenic wanted to make changes and then filed the instant lawsuit. He said that Domenic wanted to eliminate coffee breaks and make them work faster. Alan also said that Domenic hired an inexperienced outsider who would order them to perform their work in a manner that was unsafe. He stated that he left the business after Domenic filed the lawsuit.
Peter's Testimony
Fifty-five year-old Peter testified that like his brothers, he worked for the business when he was in high school. He also worked there during the summer of his junior year in college. Peter stated that he was not directly involved in constructing houses; rather, he did sales work. Also, similar to his brothers, Peter testified that he heard his father and uncles talk about how they all were owners of the business.
Peter testified that as the "questioning" member of the family, he approached Domenic and asked him why the business was not profitable. Peter then suggested to Domenic that perhaps it was a management problem, and that maybe Peter should go back to school. Peter testified that Dominic became irate and reported the event to his father. Peter also testified that some time in the 1960s, his mother questioned his father about how such a busy enterprise could be making so little money. Peter said that Domenic told both him and his mother that they should not question Domenic about the lack of profits.
Peter further testified that after he graduated with a degree in pharmacy, his father asked him where he wanted a pharmacy to be built. When Peter told him that it would be very expensive, his father told him that he should enter the family business because if he worked for someone else that other person would be the one who would benefit from Peter's labor. Peter said that he told his father that he would work in the business only on the condition that he could manage or oversee the books. He stated that his father became upset at this demand, and told him that management of the books was Domenic's job. Peter testified that he then decided not to join the business because he was not comfortable with how the business and its accounts were being managed.
Peter stated that thereafter he worked at various hospital pharmacies over the years, before transitioning into the field of information technology (IT.). He is now employed at Lifespan as an IT. manager. Peter also said that he and his brothers formed a business together in which they pooled their resources in order to purchase properties in South County for development.
Henry Jr.'s Testimony
Henry Jr. testified that when he was younger, he would visit the lumber yard on numerous occasions and watch his father and uncles work together. He further testified that Domenic frequently told him that Henry Jr. was an owner of the family businesses, and that they all had to work together for the sake of the family. Henry Jr. said he entered the family business shortly after high school. He also testified that his father and uncles repeatedly would recognize equal ownership of the businesses and the business assets.
Other Witness Tesimony
Accountant Raymond Chaput (Chaput) testified that he has worked for the businesses since 1995. He said that he filed annual partnership tax returns for the unincorporated Allen Realty business in the names of all four brothers as partners/joint tenants. He testified that the tax returns listed Domenic, Vincent, Luigi and Henry Sr. as partners in the business, and that they indicated that funds were allotted to capitol accounts belonging to the deceased brothers. Chaput further testified that it was Domenic who actually received all of the company's income and paid the taxes. He also stated that Domenic had paid back a loan of $119,000 to National Wrecking, and that National Wrecking had been paying taxes on the Ridge Road property for several years.
Richard DiGennaro (DiGennaro), a certified public accountant and compelling witness, testified on behalf of the counterclaimants. DiGennaro testified that he examined accounting records from Providence Crane, Industrial Wrecking, Allen Lumber, and Allen Realty. He stated that according to the accounting records, each brother had contributed funds to Allen Realty, and capital accounts still existed in the names of the deceased brothers.
A vocational expert named Albert Sabella (Sabella) also testified on behalf of the counterclaimants. Sabella testified that Louis, Alan and Henry Jr. described to him the different job duties that they performed when they had worked for the businesses. He stated that he then relied upon the Rhode Island Department of Labor and Training records to calculate how the counterclaimants' wages compared to similar jobs in the marketplace. He testified that he specifically excluded trade union wages from his calculations. Sabella concluded that, at most, the actual earnings of Louis, Alan and Henry Jr. were approximately 40% of the wage standard for similar-type work in Rhode Island.
 II Standard of Review
In a non-jury trial, the standard of review is governed by Rule 52(a) of the Rhode Island Superior Court Rules of Civil Procedure which provides that "in all actions tried upon the facts without a jury . . . the court shall find the facts specifically and state separately its conclusions of law thereon. . . ." Accordingly, "the trial justice sits as the trier of fact as well as of law." Hood v. Hawkins, 478 A.2d 181,184 (R.I. 1984). In a non-jury trial, it is the duty of the trial justice to weigh and consider the evidence, pass upon the credibility of witnesses, and draw proper inferences. See id.
When a case is tried without a jury, "[t]he task of determining the credibility of witnesses is peculiarly the function of the trial justice when sitting without a jury." McEntee v. Davis, 861 A.2d 459, 464 (R.I. 2004) (quoting Bogosian v. Bederman, 823 A.2d 1117, 1120 (R.I. 2003)). This is so, because the factual determinations and credibility assessments of a trial justice traditionally is accorded "a great deal of respect . . . [because it is] the judicial officer who actually observe[s] the human drama that is part and parcel of every trial and who has had the opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record." In the Matter of the Dissolution of Anderson, Zangari Bossian, 888 A.2d 973, 975 (R.I. 2006). Although the trial justice is required to make specific findings of fact, `"brief findings and conclusions are sufficient if they address and resolve the controlling and essential factual issues in the case.'" Parella v. Montalbano,899 A.2d 1226, 1239 (R.I. 2006) (quoting Donnelly v. Cowsill, 716 A.2d 742,747 (R.I. 1998)).
 III The Direct Claims A The Alleged Partnership Agreement
The central issue in this case is whether the D'Agostino brothers formed a business partnership. According to Domenic, no such partnership existed; instead, he contends that his brothers simply were his employees and that the contested properties belong solely to him. The counterclaimants dispute this assertion. They maintain that the D'Agostino brothers established a partnership in which each had an equal interest, and that they are entitled to recover their fathers' share of the business profits and the disputed properties.
A threshold issue is the standard of review to determine the existence of a partnership. See Alan R. Bromberg and Larry E. Ribstein, Brombergand Ribstein on Partnership § 2.03(a) at 2:34.[4] Generally, the burden of proving the existence of a partnership is on the one who is alleging the partnership. See Rado v. Dwares, 144 A. 145, 145 (R.I. 1929) (observing that in suits seeking the dissolution of a copartnership and an accounting, the burden of proving the existence of that partnership rests on the complainant); see also Falkner v.Falkner, 180 N.W.2d 491, 497 (1970). This burden is stricter when the alleged partners are relatives. Falkner, 180 N.W.2d at 497. ("The burden of proving whether . . . a relationship was more than employment is on the plaintiff, and because th[e] action was between relatives even stricter proof is required.) (internal citation omitted). Additionally, the fact that an alleged partner is deceased raises the burden of proof even higher. Id at 489 (stating that "stricter proof is required between partners than as against outsiders, especially when the one most interested is dead"). Consequently, this Court will apply a clear and convincing standard in reviewing the evidence. See Bromberg and Ribstein on Partnership. § 2.03(b) at 2:26 27.
Determining "whether a particular agreement constitutes a partnership is a question of law." Filippi v. Filippi, 818 A.2d 608, 618 (R.I. 2003). However, because a partnership can be created without formalities, determining its existence often is a highly fact-intensive inquiry. See Bromberg, Partnership § 2.01(a) at 2:5; see also id. § 2.03(a) at 2:24 ("The partnership determination is properly a question of law to be decided by the court when the facts are undisputed or when the only issue in the case is the legal effect of an unambiguous document.")
A partnership is defined as "an association of two (2) or more persons to carry on as co-owners a business for profit. . . ." Section7-12-17(a). Implicit in this definition, and an essential element of a partnership, is the necessity of an agreement. See Loft v. Lapidus, 936 F.2d 633, 636 (1st Cir. 1991) (stating that a partnership "is a voluntary association to carry on a business for profit based on agreement between the partners, which need not be written.") Accordingly, the agreement may be express or implied from the conduct of the persons alleged to be partners. See Byker v. Mannes, 641 N.W.2d 210,216 (2002) (stating that "in determining the existence of a partnership, the focus of inquiry is on the parties' actual conduct in their business arrangements, as opposed to whether the parties subjectively intend that such arrangements give rise to a partnership").
Where no express agreement exists, several factors consistently are employed to determine the existence of a partnership. First and foremost is whether the alleged partners share in the profits of the business, because sharing in the profits of a business is prima facie evidence that a partnership exists. See § 7-12-18(4).[5] However, other factors indicating a partnership relationship include the intent of the parties, the investment of capital, the existence of partnership property, and participation in management and control of the business. SeeDreyfuss v. Drevfuss. 701 So.2d 437, 439-40 (Fl.Dist.Ct.App. 1997) ("A partnership is only established when both parties contribute to the capital or labor of the business, have a mutuality of interest in both profits and losses, and agree to share in the assets and liabilities of the business."); see also Commissioner of Internal Revenue v.Culbertson, 337 U.S. 773, 742 (1949) (holding that the critical question in a tax case involving a familial relationship was "whether considering all the facts — the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent — the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise").
With respect to partnership property, "[a]ll property . . . subsequently acquired by purchase or otherwise, on account of the partnership, is partnership property." Section 7-12-19(a). Furthermore, "[u]nless the contrary intention appears, property acquired with partnership funds is partnership property." Section 7-12-19(b). Although a partnership may acquire property in the partnership name, § 7-12-19(b) does not preclude partnership property being held in the name of an individual partner. See Section 7-12-19(c) ("Any estate in real propertymay be acquired in the partnership name.") (emphasis added).[6]
In the instant matter, Domenic asserts that the disputed businesses are currently losing money; however, even if this actually is true, this Court is satisfied that National Wrecking, Providence Crane, Industrial Wrecking, Allen Lumber, and Allen Realty all were established for the purpose of earning profits. See Section 7-12-13(2) (defining a business as "every trade, occupation, or profession"). However, the issue is whether these businesses were owned solely by Domenic, or were established pursuant to a partnership agreement among the brothers.
This Court finds that the circumstances in this case amounted to a "male only club" in which Domenic assumed the role of patriarch. All of the D'Agostino brothers and nephews enjoyed the work. In fact, they "lived and breathed" it. It was a family business and they were happy working together: brothers with brothers, nephews with nephews (with the exception of Tom), and generation with generation. It also is obvious to this Court that the less input from, or interaction with, "outsiders" the better. Until 2005, the brothers and nephews ceded the public face of the businesses to Domenic. Ultimately, however, they were ill served by him.
Domenic's testimony is incredible, beyond belief, and self-serving. It is circuitous, and littered with inconsistencies and contradictions; namely, denying that his brothers were officers in any of the businesses (See Plaintiffs Exhibit # 25), denying that Henry Sr. ever owned any property (See Defendants' Exhibit A), and denying that his brothers contributed anything to the businesses (See Plaintiffs Exibit #25). It is inconceivable that his brothers and nephews accepted his characterization of the businesses as he describes them today.
The counterclaimants constitute a tight-knit, hard-working articulate group of men, some of whom have earned higher educational degrees than others. They demonstrated good faith, hard work, and collective optimism relative to "their" family business. They have proven by clear and convincing evidence that an oral partnership agreement existed among the D'Agostino brothers with respect to all of the businesses.
The record reveals that Domenic and his brothers were very close, particularly Domenic and Henry Sr., as evidenced by their reciprocal powers of attorney. The record further reveals that each brother performed tasks for the businesses according to their individual abilities; thus, the fact that Domenic organized the administrative portion of the businesses while his brothers performed physical labor does not mandate the conclusion that only he owned the businesses.See Smith v. Redd, 593 So.2d 989, 994 (Miss. 1991) ("Control by itself is not the exclusive indicator of partnership.")
This Court finds credible the testimony from Henry Jr., and Louis that their fathers and uncles frequently discussed the fact that the D'Agostino brothers were equal owners of the businesses, and that they also discussed the potential sale of the Ridge Road property with the proceeds to be divided equally among the families. This Court also finds credible Chaput's testimony that National Wrecking paid taxes on the Ridge Road property. In light of these findings, this Court rejects Domenic's testimony that he used his personal funds to purchase the Ridge Road property and that he paid all of the taxes on the property.
This Court further finds credible the testimony from the D'Agostino nephews that the D'Agostino brothers, including Domenic, repeatedly assured the D'Agostino nephews that they also were partners in the family businesses. Although Domenic asserted that his brothers and nephews were his employees, the fact that they were willing to work for wages that were approximately 60% below the industry standard strongly supports the D'Agostino nephews' contention that they did so because they were asked to make sacrifices for the family partnership, and they did so willingly because as far as they were concerned, it was their business and they loved their work.
Furthermore, the record demonstrates that all of the D'Agostino brothers contributed capital to Allen Realty, and all of them were listed as partners on the tax returns. These facts lend further support to this Court's conclusion that the D'Agostino brothers worked as partners. Finally, although Domenic may have attended numerous closings, this Court does not find credible his testimony that he purchased the disputed properties with his own funds. This Court believes the D'Agostino nephews when they stated that the D'Agostino brothers discussed major business decisions together; consequently, although Domenic may have attended various closings on his own, this Court finds that in doing so, he merely was carrying out agreed-upon partnership business.
This Court finds by clear and convincing evidence that the D'Agostino brothers formed a business partnership, and that said partnership owned National Wrecking, Providence Crane, Industrial Wrecking, Allen Lumber, Allen Realty, the Ridge Road property, the Grotto Avenue property and any other business assets. The present status of that partnership will be discussed infra.
 B Constructive Trust
Domenic asserts that he owns the Ridge Road and Grotto Avenue properties outright. In support of this assertion, he observes that "[e]ven Henry's children conceded that Henry was never the sole owner of the Ridge Road properties." Plaintiffs Post-Trial Brief at [3]. Domenic contends that Henry Sr. owed him a fiduciary duty, and that "[b]y repeatedly refusing to transfer the deed [for the Ridge Road property] to Domenic, Nancy and her children breached Henry's continuing fiduciary duty to Domenic." Id at 5. As a result of this alleged breach, Domenic seeks this Court to impose a constructive trust in his favor.
It is well settled that "[e]quity resorts to the remedial device of a constructive trust to accomplish justice." Simpson v. Dailey,496 A.2d 126, 128 (R.I. 1985). Accordingly, "[t]he underlying principle of a constructive trust is the equitable prevention of unjust enrichment of one party at the expense of another in situations in which legal title to property was obtained by fraud or in violation of a fiduciary or confidential relationship." Dellagrotta v. Dellagrotta, 873 A.2d 101,111 (R.I. 2005) (quoting Renaud v. Ewait 712 A.2d 884, 885 (R.I. 1998)). When seeking the imposition of a constructive trust, a party must prove the essential elements by clear and convincing evidence; namely, "the existence of a fiduciary or confidential relationship between the parties and either a breach of a fiduciary duty or fraud resulting from the parties confidential association." Dellagrotta, 873 A.2d at 111.
It is well settled that "[c]ommon-law fraud consists of a false or misleading statement of material fact that was known by the defendant to be false and was made with intent to deceive, upon which the plaintiff justifiably relies to its detriment." Nisenzon v. Sadowski,689 A.2d 1037, 1051 (R.I. 1997). A misrepresentation transpires "when there is a `manifestation by words or other conduct by one person to another that, under the circumstances, amounts to an assertion not in accordance with the facts.'" Id (quoting Dudzik v. Leesona Corp., 473 A.2d 762, 766
(R.I. 1984)). Such a misrepresentation "becomes material when it is likely to affect the conduct of a reasonable person with reference to a transaction with another person." Nisenzon, 689 A.2d at 1051.
In the present case, there is no question that a fiduciary relationship existed between Domenic and Henry Sr., both as a result of their reciprocal powers of attorney, as well as the fiduciary duty that they owed to each other as partners in the family business.See Section 7-12-32.[7] However, there is no evidence that Henry Sr. ever committed fraud or breached his fiduciary duty against either Domenic or the partnership; consequently, Domenic is not entitled to a constructive trust on the Ridge Road property. Indeed, considering this Court's conclusion that the partnership owned the Ridge Road property, any imposition of a constructive trust would be in favor of the partnership rather than in favor of any of the individual parties in this case.
 C Resulting Trust
In the alternative, Domenic asserts that he is entitled to a resulting trust for both the Ridge Road and Grotto Avenue properties. However, he has not presented evidence supporting this claim.
In order to establish a resulting trust, "[t]here must be clear, full and convincing evidence that at the time of the conveyance it was the intention and understanding that the contributor was to have the beneficial ownership in the whole or in a definite fractional part."J. K. Social Club v. J. K. Realty Corp., 448 A.2d 130, 133 (R.I. 1982). Furthermore, "a mere general monetary contribution by itself will not establish a resulting trust." Id
Domenic has not produced any evidence of a present intent to establish a trust at the time the Ridge Road and Grotto Avenue properties were conveyed. Furthermore, this Court already has determined that the properties properly belong to the partnership. Consequently, Domenic is not entitled to a resulting trust for either property.
 D Adverse Possession
Domenic further maintains that he is entitled to the Ridge Road and Grotto Avenue properties by way of adverse possession. In support of said claims, he asserts that he had actual and exclusive possession of the properties under claims of ownership for ten years.
It is axiomatic "that to establish adverse possession, a claimant's possession must be `actual, open, notorious, hostile, under claim of right, continuous, and exclusive' for at least ten years." Acampora v.Pearson. 899 A.2d 459, 466 (R.I. 2006) (quoting Tavares v. Beck.814 A.2d 346, 350 (R.I. 2003)). Furthermore, "[t]he onus is on the party claiming adverse possession to establish these elements by clear and convincing evidence." Id To prove a claim of right, the claimant must produce
 "evidence of open, visible acts or declarations, accompanied by use of the property in an objectively observable manner that is inconsistent with the rights of the record owner. In other words, `a claim of right to own or use property will arise by implication through objective acts of ownership that are adverse to the true owner's rights, one of which is to exclude or to prevent such use.'" Tavares, 814 A.2d at 351 (citations omitted).
In this case, although title to the Ridge Road property was in Henry Sr.'s name, the property actually belonged to the partnership. National Wrecking used the property as a storage yard and paid the property taxes for several years. As already found by this Court, National Wrecking belonged to the partnership and conducted its business on the Ridge Road property. Thus, although Domenic may have occupied the property, such occupation was not exclusive. 22 Indeed, because he was conducting partnership business on the property, his occupation was in furtherance of, rather than adverse to, the partnership.
Similarly, the Grotto Avenue property also was used and occupied by the partnership. Both National Wrecking and Providence Crane utilized the property. Furthermore, title to the property is in the D'Agostino brothers as tenants in common. See M B Realty, Inc. v. Duval,767 A.2d 60, 65 (R.I. 2001) ("It is well-settled that `[s]tronger evidence is required to establish the adverse possession of a co-tenant than the adverse possession of a stranger.'") (quoting Spangler v. Schaus,106 R.I. 795, 804, 264 A.2d 161, 166 (1970)). As a result, Domenic was required to demonstrate "acts of possession that are `not only inconsistent with but in exclusion of the continuing rights of the other cotenants.'" Id Domenic has not satisfied this burden; consequently, his claim of adverse possession of the Grotto Avenue property also must fail.
 E Reformation of Grotto Avenue Deed
Domenic asserts that due to a clerical error, title to the Grotto Avenue property was placed in the names of the D'Agostino brothers as tenants in common. He contends that they had intended to purchase the property as joint tenants and he now seeks this Court to reform the deed to reflect that intent.
When seeking "the reformation of a deed on the ground of mutual mistake, it [is] necessary to establish such mistake by clear and convincing evidence before a reformation of such an instrument should be granted." Nunes v. Meadowbrook Development Co., Inc., 824 A.2d 421, 425
(R.I. 2003). Furthermore, "[t]o warrant reformation, it must appear that by reason of a mistake, common to the parties, their agreement fails in some material respect correctly to reflect their prior completed understanding." Id The determinative factor is the parties' intent.Id. Accordingly, "the credibility of the witnesses and the weight of the evidence must be such as clearly to convince the court without hesitancy of the truth of the precise facts in issue." Id.
The record reveals that the D'Agostino brothers purchased the Grotto Avenue property in their capacities as joint tenants of Allen Realty. According to Domenic, the D'Agostino brothers thought that they owned the property as tenants in common, not as joint tenants. However, other than Domenic's less than credible testimony, he has not offered any evidence of the D'Agostino brothers' intent to purchase the property as tenants in common. Furthermore, this Court finds more credible the opposing testimony of the D'Agostino nephews concerning the representations made by their fathers, and even Domenic himself, that a family partnership existed, and concludes that the deceased brothers considered all of the businesses and business assets as belonging to the partnership. Accordingly, Domenic's prayer for partition of the Grotto Avenue property is denied.
 IV The Counterclaims
The counterclaimants allege that Domenic is attempting to fraudulently deprive them of their ownership interests in the Ridge Road property by misrepresenting who owns the property, and they seek this Court to certify title in the rightful owners. In their Third Party Complaint, they seek an accounting of National Wrecking in order to ascertain the profits and equitable distribution from that business. They further allege that the partnership businesses are liable for tortious conversion of business assets, and seek their alleged rightful share to the profits and/or proceeds. Finally, they maintain that they are entitled to reasonable attorney's fees and punitive damages.
 A Fraud and Misrepresentation
The counterclaimants allege that Dominic misrepresented that he was taking care of their interests in the Ridge Road property, and that he made material misrepresentations to them concerning their ownership interest in the property in an attempt to defraud. They maintain that they relied upon these misrepresentations to their detriment, and now seek compensatory damages as well as attorney's fees and punitive damages.
As already noted supra, "[c]ommon-law fraud consists of a false or misleading statement of material fact that was known by the defendant to be false and was made with intent to deceive, upon which the plaintiff justifiably relies to its detriment." Nisenzon v. Sadowski,689 A.2d 1037, 1051 (R.I. 1997). Although the counterclaimants assert that they relied upon Domenic's alleged misrepresentations to their detriment, this Court can find no evidence to support such a contention. Consequently, the counterclaimants' fraud and misrepresentation claim must fail.
 B The Right to an Account and Certification of Title
The counterclaimants are seeking this Court to order an accounting of National Wrecking so that its profits can be ascertained and equitably distributed. Thus, essentially they are seeking a dissolution and winding up of the partnership.
Pursuant to the Uniform Partnership Act, "[t]he dissolution of a partnership is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business." Section 7-12-40. "Dissolution is caused . . . [b]y the death of any partner. . . ." Section 7-12-42.[8]
Furthermore, "[o]n dissolution the partnership is not terminated, but continues until the winding up of partnership affairs is completed." Section 7-12-41. Additionally,
 "Any partner has the right to a formal account as to partnership affairs:
 (1) If he or she is wrongfully excluded from the partnership business or possession of its property by his or her copartners.
 (2) If the right exists under the terms of any agreement.
 (3) As provided by § 7-12-32.
 (4) Whenever other circumstances render it just and reasonable." Section 7-12-33.
Section 7-12-32 provides:
 "(a) Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him or her without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him or her of its property.
 (b) This section applies also to the representatives of a deceased partner engaged in the liquidation of the affairs of the partnership as the personal representatives of the last surviving partner."
Once a partnership is wound up, then the proceeds are distributed according to the Partnership Act. See § 7-12-51 (providing that upon dissolution, liabilities to partnership creditors must be settled first, then liabilities to partners other than for capital and profits, then the return of capital to the partners, and finally, distribution of profits to the partners).
It is undisputed that Henry Sr. died in 1984, Luigi died in 1989, and Vincent died in 1992. The death of Henry Sr. dissolved the partnership by operation of law; however, the surviving brothers continued to work together in partnership with each other without winding up the business and distributing the proceeds, if any, to Henry Sr.'s estate. Assuming, without deciding, that Henry Sr. and Luigi assigned their partnership interests to their sons, and that the partnership did not dissolve upon their deaths, Vincent's death in 1992 dissolved any partnership that might have existed at that time. See § 7-12-38.[9] As possible assignees and actual heirs, they were entitled to an accounting and distribution, as were the other counterclaimants in this case; however, Vincent failed in his duty to wind up the partnership at that time.
In view of the foregoing, this Court orders a formal accounting of the partnership and an equitable distribution of the proceeds, if any, to the heirs of Henry Sr., Luigi and Vincent. As this Court has determined that the Ridge Road Property belongs to the partnership, coupled with this Court's order of an accounting, it is not necessary to order a certification of title to that property.
 C Conversion
The counterclaimants contend that the partnership businesses tortiously converted partnership assets and profits for Domenic's exclusive use. They seek this Court to order the return their rightful share of the profits and/or proceeds.
It is well established that "the gravamen of an action for conversion lies in the defendant's taking the plaintiffs personalty without consent and exercising dominion over it inconsistent with the plaintiffs right to possession." Ames v. Oceanside Welding and Towing Co., Inc.,767 A.2d 677, 680 (R.I. 2001) (quoting Montecalvo v. Mandarelli, 682 A.2d 918,928 (R.I. 1996)). Accordingly, "in order to sustain an action for conversion of personal chattels, a plaintiff must demonstrate an ownership or possessory interest in the property at the time of the conversion . . . [and] must also identify the allegedly converted property with reasonable certainty, in order to render it capable of identification, for the purpose of determining whether the property in fact belonged to the plaintiff at the time of its conversion."DeChristofaro v. Machala, 685 A.2d 258, 263 (R.I. 1996) (internal citation omitted). Money may be regarded as "a form of property subject to conversion" where that money is specifically identifiable. Id "The question of whether money can be the subject matter of an action for conversion generally depends on whether the defendant is under any obligation to deliver specific money to the plaintiff." Id
In the instant matter, accountant Chaput testified that he filed tax returns on behalf of Allen Realty. He stated that despite the fact that said returns allegedly allotted the income to capital accounts belonging to each of the D'Agostino brothers, only Domenic received any income. By giving all of the income to Domenic, rather than distributing it to the capital accounts, Allen Realty tortiously converted those funds. As a result, Domenic must return the income that should have been distributed to the other brothers, or their heirs.[10] If it becomes evident during the accounting that other partnership businesses earned profits or sold partnership assets, and that said profits/proceeds were wrongfully converted, likewise, they must be returned to their rightful owners.
 D Punitive Damages and Attorney's Fees
The counterclaimants seek this Court to impose punitive damages and assess attorney's fees against Domenic. However, the facts in this case do not support the imposition of either punitive damages or attorney's fees.
It is axiomatic that `"[t]he nature of punitive or exemplary damages is twofold: to punish the tortfeasor whose wrongful conduct was malicious or intentional and to deter him or her and others from similar extreme conduct.'" Zarrella v. Minnesota Mut. Life Ins. Co.,824 A.2d 1249, 1262 (R.I. 2003) (quoting Palmisano v. Toth, 624 A.2d 314, 317-18
(R.I. 1993). Furthermore, "the party seeking punitive damages has the burden of producing `evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amount[s] to criminality, which for the good of society and warning to the individual, ought to be punished.'" Id; see also Cady v. IMC Mortg.Co.. 862 A.2d 202, 219 (R.I. 2004) ("The standard in Rhode Island for imposing punitive damages is rigorous and will be satisfied only in instances wherein a defendant's conduct requires deterrence and punishment over and above that provided in an award of compensatory damages.") Thus, this Court must "determine whether the party seeking punitive damages has met this high standard to support such an award. . . ." Id at 220.
In the instant matter, the counterclaimants have not met their burden of proving that Domenic's conduct rose to the level of "willfulness, recklessness or wickedness" that would amount to "criminality" necessitating deterrence and punishment. See Zarrella, 824 A.2d at 1262. Furthermore, this Court concludes that the counterclaimants have been compensated appropriately, and denies their request for punitive damages.
With respect to attorney's fees, it is well settled that "[attorney's fees . . . are not ordinarily recoverable as an element of damages, in the absence of a statute or enforceable contractual provision providing for them." Kelts v. Town of Lincoln, 874 A.2d 204, 215 (R.I. 2005) (quoting 22 Am. Jur.2d Damages § 430 at 384-85 (2003)). In this case, there is no applicable statute or enforceable contract that would permit the counterclaimants to recover attorney's fees; consequently, this Court denies their request for said fees.
 IV Conclusion
For the foregoing reasons, this Court denies and dismisses all of Domenic's claims. Likewise, apart from the counterclaimants' request for an accounting and claim of conversion, the counterclaims and Third-Party Complaint are denied and dismissed.
With respect to the request for an accounting, this Court finds that the D'Agostino brothers formed a business partnership after World War II. This Court further finds that said partnership established various businesses, including National Wrecking, Providence Crane, Industrial Wrecking, Allen Lumber and Allen Realty, and acquired real estate, including the Grotto Avenue and Ridge Road properties. This Court concludes that at the latest, the partnership was dissolved by operation of law upon Vincent's death in 1992, and it orders the appointment of an independent auditor to perform an accounting and distribute the proceeds in accordance with § 7-12-51. Punitive damages and attorney's fees also are denied.
Counsel shall submit an appropriate order consistent with this decision.
[1] A fifth brother, Angelo (a.k.a. Charlie), also deceased, does not appear to have been involved in the contested enterprises.
[2] The documents do not indicate whether they were referring to Henry Sr. or Henry, Jr.; however, they do indicate that either the father or the son somehow was involved in the management of these companies.
[3] Henry Sr. died in 1984, Luigi died in 1989, and Vincent died in 1992.
[4] As Rhode Island Partnership law is based upon the Uniform Partnership Act, and because of the dearth of Rhode Island case law regarding the determination of a partnership, this Court will look to other sources for support. See Section 7-12-12 ("Sections 7-12-12
— 7-12-55 may be cited as the `Uniform Partnership Act.'"); seealso Section 17-2-15(d) ("Sections 7-12-12 — 7-12-55 shall be so interpreted and construed as to effect their general purpose to make uniform the law of those states which enact them.")
[5] Section 7-12-18(4) provides in pertinent part:
 "The receipt by a person of a share of the profits of a business is prima facie evidence that he or she is a partner in the business, but no such inference is drawn if profits were received in payment:
 . . .
 (ii) As wages of an employee . . .;
 . . . .
 (iii) As an annuity to a widow or representative of a deceased partner. . . .
[6] See Mill Realty Associates v. Crowe. 841 A.2d 668, 677 (R.I. 2004) (recognizing that "the ordinary meaning of the word may is permissive and not compulsory") (citing Carlson v. McLyman, 77 R.I. 177, 182,74 A.2d 853, 855 (1950)).
[7] Section 7-12-32 provides:
 "(a) Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him or her without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him or her of its property.
 (b) This section applies also to the representatives of a deceased partner engaged in the liquidation of the affairs of the partnership as the personal representatives of the last surviving partner."
[8] Domenic asserts that the counterclaims "are barred by laches, waiver, estoppel and unclean hands," because the counterclaimants failed to make their claims sooner. However, it was not their responsibility to make any claims against the partnership, because when "a partnership is dissolved by the death of one of the partners . . . ordinarily it then becomes the duty of the surviving partner to wind up the partnership business within a reasonable time; that while so doing he bears a fiduciary relationship to those interested in the deceased partner's estate; and that the burden is on the surviving partner to account fully to them as to partnership matters." Littlefield v. Gorton, 65 R.I. 390, 14 A.2d682, 685 (R.I. 1940).
[9] Section 7-12-38 provides:
 "(a) A conveyance by a partner of his or her interest in the partnership does not of itself dissolve the partnership, nor, as against the other partners in the absence of agreement, entitle the assignee, during the continuance of the partnership, to interfere in the management or administration of the partnership business or affairs, to require any information or account of partnership transactions, or to inspect the partnership book. It merely entitles the assignee to receive in accordance with his or her contract the profits to which the assigning partner would otherwise be entitled.
 (b) In case of a dissolution of the partnership, the assignee is entitled to receive his or her assignor's interest and may require an account from the date only of the last account agreed to by all the partners."
[10] Vincent's proportion should be distributed according to his will, if he had one; otherwise, it should be distributed according to the laws of intestacy.